[No. 49409–6. En Banc. March 7, 1985.]

NISQUALLY DELTA ASSOCIATION, ET AL, *Appellants,* v. THE CITY OF DUPONT, ET AL, *Respondents.*

*J. Richard Aramburu,* for appellants.

*James J. Mason,* for respondent City of Dupont.

*Hillis, Phillips, Cairncross, Clark & Martin, P.S.,* by *Jerome L. Hillis* and *Glenn J. Amster,* for respondent Weyerhaeuser Co.

*Kenneth O. Eikenberry, Attorney General,* and *Charles W. Lean, Assistant,* for respondent State.

DOLLIVER, C.J.—Plaintiffs Nisqually Delta Association and Washington Environmental Council appeal the Superior Court judgment affirming the approval by the Shorelines Hearings Board (SHB) of shoreline substantial development and conditional use permits for the proposed forest products export facility of defendant Weyerhaeuser Company (Weyco) to be built within the city of DuPont.

Plaintiffs raise narrow procedural issues involving notice requirements under the State Environmental Policy Act of 1971, RCW 43.21C (SEPA); the Shoreline Management Act of 1971, RCW 90.58 (SMA); compliance with the Shorelines Master Program of the City of DuPont, adopted pursuant to the SMA; and admissibility of certain evidence at the SHB hearing. We find no significant procedural irregularities and, therefore, affirm the judgment of the trial court and the SHB.

The city of DuPont is in Pierce County near the northern edge of Thurston County. It is within the Nisqually Delta, an area designated by the SMA as being a shoreline of "statewide significance". RCW 90.58.030(2)(e)(ii)(A). The City is, however, to the north of, and outside, the Nisqually National Wildlife Refuge area. The site of the proposed export facility is within the urban classification of the City of DuPont's Shorelines Master Program (DSMP), located on land once owned by E. I. duPont DeNemours & Company, Inc. (Dupco). Dupco manufactured explosives on a

portion of the tract (1,200 acres) from 1909 to 1975, and shipped explosives from an adjacent dock. Fort Lewis used and continues to use approximately 600 acres of the site as a training area, sanitary landfill, and rifle range.

In 1976, Weyco proposed construction of an export facility at DuPont for shipping its forest products. Weyco now owns approximately 3,200 acres within the city. The proposed facility would occupy approximately 250 of those acres and include the following: 140– by 1,320–foot concrete dock with loading equipment; 57– by 500–foot concrete causeway; marshaling area and terminal for receiving, handling, and storage; and road and rail access. The dock, as finally proposed, would be located approximately one–half mile from the Nisqually National Wildlife Refuge, while the remaining upland facilities would be located one–half mile from Puget Sound.

Weyco's proposal for an export facility triggered SEPA. Pursuant to SEPA guidelines, Weyco submitted a completed environmental checklist to DuPont which assumed lead agency responsibility for the proposal. DuPont determined the proposal would require an environmental impact statement (EIS). Predraft consultation procedures were initiated, and in August 1978 DuPont published the draft EIS for the export facility. The draft was circulated among various federal, state, and local agencies and organizations for their comments and suggestions on the project. Copies of the draft EIS were sent to plaintiffs. Based on the testimony obtained through public hearings and comments received during the circulation period, DuPont revised the draft and issued the final EIS for the export facility in February 1979.

The adequacy of the final EIS has been adjudicated and is not at issue here. The Department of Ecology (DOE) determined that the final EIS met all legal requirements after lead agency responsibility was transferred to it in March 1979. Plaintiffs challenged the adequacy of the EIS in Pierce County Superior Court, where it was upheld. Plaintiffs have since withdrawn their appeal of the trial

court's judgment.

The final EIS described and evaluated both a "proposed" and an "alternative" location. The alternative location was further to the south, closer to the wildlife refuge. The proposed northern location, however, crossed the jurisdictional boundary between DuPont and Pierce County, and consequently the boundary between the "urban" shoreline designation in DuPont and the "conservancy" shoreline designation in the Pierce County Shorelines Master Program.

As a substantial shoreline development, under the SMA, Weyco's proposal requires a permit issued by the controlling jurisdiction (the City of DuPont). Such a permit must be consistent with DuPont's master program, which in turn must be consistent with state policy. RCW 90.58.140. In August 1978, Weyco applied for a permit for construction of its dock at the northern proposed location described in the EIS, but because the proposed location extended into Pierce County's conservancy shoreline, Weyco altered its plans. In January 1981, it submitted to DuPont another application for a shoreline substantial development permit. In its application, Weyco proposed to locate the dock portion of the facility between and overlapping the proposed northern and alternative southern dock locations, entirely within DuPont city limits. This location will be referred to as the "final" or "application" proposal. The dimensions of the facility are the same in each proposal.

Because the application showed a dock location not precisely depicted in the EIS, DuPont asked DOE to review the EIS to determine whether the design change warranted preparation of a supplemental EIS. DOE did so, and informed DuPont the EIS adequately described and discussed the environmental impacts of the final proposal. No formal notice of any change in the proposed dock location was given to any of the more than 20 agencies receiving the final EIS.

On January 21, 1981, upon due notice as required by RCW 90.58.140(4), the DuPont City Council held a public

hearing on the Weyco substantial development application. Weyco, plaintiffs, and other members of the public appeared and submitted oral and written testimony. On February 18, 1981, the Council unanimously voted to issue the permit after imposing specific conditions on the proposal to mitigate adverse effects. Plaintiffs filed a request for review with the SHB challenging the substantial development permit and alleging a conditional use permit was required under the DSMP.

The significance of a conditional use permit lies in the requirement that the local permit be submitted to DOE for approval or disapproval. RCW 90.58.140(12). The SHB noted that DOE's original approval of the DuPont master program did not limit the types of development in the urban designation. However, inclusion of conditional use permits in the city's master program gave DOE flexibility and control over subsequent developments and their impacts on the Nisqually Delta.

Weyco then requested DuPont to reprocess its shoreline permit application under the conditional use procedures. Notice was again published and posted and a public meeting held. The Council unanimously approved the conditional use permit. The permit was approved by DOE in August 1981. In October 1981, plaintiffs filed another request for review challenging DuPont's issuance of the permits and DOE's approval.

Plaintiffs' appeals were consolidated and hearings held before the SHB for 6 days in January 1982. In May 1982, the SHB confirmed the issuance of the permits, but placed several additional conditions on the proposal.

■ Plaintiffs sought judicial review under RCW 34.04-.130 in Thurston County Superior Court. The trial court affirmed the SHB decision to issue the shoreline permits. A transfer from Court of Appeals, Division Two, was granted and direct review accepted by this court. The administrative procedure act (RCW 34.04.130) governs judicial review of SHB decisions. RCW 90.58.180(3). This court applies the "clearly erroneous" review standard of RCW 34.04.130(6)(e)

directly to the challenged administrative decisions. *Depart-ment of Ecology v. Ballard Elks Lodge 827,* 84 Wn.2d 551, 555, 527 P.2d 1121 (1974). Under this standard, "agency action may be reversed where the reviewing court is firmly convinced that a mistake has been committed, even though there is evidence supporting the action." *Hayes v. Yount,* 87 Wn.2d 280, 286, 552 P.2d 1038 (1976). Additionally, when reviewing such decisions, we have recognized and deferred to the expertise of the administrative agency. *Hayes v. Yount, supra* at 289.

In our review of the decisions below, it is tempting to rhapsodize about the pristine beauty of the Nisqually Delta. It is also tempting to express the wish that time and human hands not disturb its natural tranquility. This is not, however, the task before this court. Rather, our obliga-tion is to interpret state and local laws as they apply to the issuance of permits to build an export facility within the city of DuPont in an area designated for urban uses.

In applying the law, we look first to its overall policy. The SMA does not prohibit development of the state's shorelines, but calls instead for "coordinated planning . . . recognizing and protecting private property rights consis-tent with the public interest." RCW 90.58.020. Designation of a shoreline as of "state–wide significance" does not pre-vent all development. That designation provides greater procedural safeguards, but permits limited alteration of the natural shorelines, with priority given to "residences, ports, shoreline recreational uses including . . . industrial and commercial developments which are particularly dependent on their location on or use of the shorelines of the state . . ." RCW 90.58.020.

We next address the specific issues raised by plaintiffs as to adequate notice, compliance with the DSMP, and the admissibility of evidence.

I

NOTICE

Plaintiffs contend defendants' notice in applying for sub-

stantial development and conditional use permits was procedurally defective. First, plaintiffs point to defendants' notice of application, which referred the public to the final EIS for a "complete project description". The final EIS depicted the "proposed" and "alternative" dock sites which Weyco was considering before 1981. As noted above, however, the site for which application was made actually overlapped both the "proposed" and "alternative" sites. Plaintiffs argue this difference misled the public.

DuPont, however, complied with the SMA public notice requirements. RCW 90.58.140(4); WAC 173–14–070. Notice of Weyco's permit application was published in the Tacoma News Tribune and posted in five places on the property. The description of the dock location given in the notice was patterned exactly after WAC 173–14–070. Papers on file at DuPont City Hall indicated the final proposed dock location.

■ The purpose of notice statutes is to apprise fairly and sufficiently those who may be affected of the nature and character of an action so they may intelligently prepare for the hearing. *Barrie v. Kitsap Cy.*, 84 Wn.2d 579, 585, 527 P.2d 1377 (1974). Here, the final EIS adequately disclosed the impacts of both the "proposed" and "alternative" dock locations. The SHB found that there were "no significant differences" shown in impacts between the dock locations described in the EIS and the location in the application. Plaintiffs make no showing anyone was actually misled by the application nor unprepared for the hearings. Under these circumstances, notice was adequate.

Second, plaintiffs assign error to the fact defendants failed to notify adjacent jurisdictions of the pending permit application. No mention of notice to adjoining jurisdictions is made in RCW 90.58.140(4), the SMA notice statute. Plaintiffs argue nonetheless that such notice is mandated by *Save a Valuable Env't v. Bothell*, 89 Wn.2d 862, 576 P.2d 401 (1978). Under *Save a Valuable Env't*, "[w]here the potential exists that a zoning action will cause a serious environmental effect outside jurisdictional borders, the

zoning body must serve the welfare of the entire affected community." *Save,* at 869. The "affected community" is determined on the basis of the seriousness of the impact, and that impact must be direct.

■ To require additional notice, plaintiffs must show the final dock location will have some serious impact on adjoining jurisdictions over and above the impact discussed in the EIS. Plaintiffs have not done so. Moreover, there has been no expression of opposition from adjoining jurisdictions. *See Save,* at 868.

Third, plaintiffs contend defendants erred in not circulating a written statement disclosing they were using the final EIS to suffice for an environmental analysis on the final dock location. Plaintiffs rely on SEPA regulations under WAC 197–10–660. WAC 197–10–660(2) states if a "new proposed action" will have an impact on the environment that was not adequately analyzed by the former EIS, then the lead agency shall prepare a supplemental EIS. Supplementation is also required under WAC 197–10–660(1)(b) where an intervening change in circumstances will make the previous EIS misleading when applied to the "new proposed action". However, if the action will not have an environmental impact substantially different from the earlier proposed action, the lead agency may prepare a written statement so indicating, and it is not required to prepare a new or supplemental draft or final EIS. WAC 197–10–660(3).

Plaintiffs contend the change in dock location amounts to a "new proposed action", necessitating either a supplemental EIS or a written statement indicating that one is not required. Defendants counter that the application does not constitute a new proposal. They rely on the SHB finding that there were no significant differences between the earlier proposals and the final proposal. *See Barrie v. Kitsap Cy. Boundary Review Bd.,* 97 Wn.2d 232, 234, 643 P.2d 433 (1982).

The application site is an amalgam of the prior proposal and the alternative proposal, and its dimensions remain

unchanged. It cannot fairly be considered a new proposal requiring either a supplemental EIS or a written statement issued by DOE. The final EIS fully evaluated the impacts of both earlier proposals. DOE properly concluded that the final proposal was neither a substantial change nor a new proposal.

## II
### SHORELINES MASTER PROGRAM

The DuPont Shorelines Master Program was approved by DOE in 1975, pursuant to WAC 173–19–3503; RCW 90.58.080, .090. The DSMP permits ports and water related industry within its urban designation, but subjects them to conditional use requirements. The DSMP and the DOE (WAC 173–16–070(1)) conditional use guidelines are similar. The DOE guidelines provide, in pertinent part:

> Conditional use permits will be granted only after the applicant can demonstrate all of the following:
> (a) The use will cause no unreasonably adverse effects on the environment or other uses.
> (b) The use will not interfere with public use of public shorelines.
> (c) Design of the site will be compatible with the surroundings and the Master Program.
> (d) The proposed use will not be contrary to the general intent of the master program.

The DSMP changes are as follows: In subsection (a), the word "unreasonably" has been omitted from the DSMP to read "no adverse effects on the environment or other uses." In subsection (b), the word "not" has been replaced with "in no way" and the word "public" has been replaced by "the" to read "will in no way interfere with public use of the shorelines." In subsection (c), the words "and the Master Program" have been eliminated. "Adverse effect" is nowhere defined.

Plaintiffs contend these changes in language show that DuPont intended to make its conditional use criteria more restrictive than the DOE guidelines. They argue that the SHB erred in applying a "reasonableness" standard to the

DSMP requirements. In approving the permit, the SHB found adverse effects, "but not unreasonably so." Plaintiffs argue this violates the legislative intent behind DuPont's omission of the word "unreasonably" and creates an ad hoc amendment. In short, plaintiffs propose a literal interpretation of the "no adverse effects" language.

Defendants, on the other hand, assert the SHB correctly interpreted DSMP conditional use criteria. They maintain their export facility not only complies with, but furthers, the DSMP. Moreover, defendants contend a literal interpretation of "no adverse effects" would prohibit construction of any port facility and is inconsistent with the area's urban designation.

■ ■ The question, then, is whether a literal interpretation of the conditional use requirements ("no adverse effects") is consistent with the city council's intent as expressed in the DSMP as a whole. We view the locally adopted plan as we would a statute. In interpreting a statute, it is the duty of the court to ascertain and give effect to legislative intent and purpose, as expressed in the act. The act must be construed as a whole and, if possible, the provisions of the act should be harmonized to insure proper construction. *Tommy P. v. Board of Cy. Comm'rs*, 97 Wn.2d 385, 391, 645 P.2d 697 (1982).

The introductory comments to the DSMP express the following intent:

"[T]his program is directed to long range planning in the order of 20 – 30 years into the future. During this period we envision *significant development of the property for industrial, commercial, residential and recreational uses.*

(Italics ours.) The general goal of the DSMP is:

[T]o develop the full potential of DuPont's shoreline in accord with the unusual opportunity presented by its relation to the City and surrounding area, its natural resources values, and its unique aesthetic qualities offered by water, topography, views, and its maritime character. Any such development would be ordered and diversified with the goal of preserving and enhancing the

environment to the end that it shall return to the community, state, private property owners, and public–at–large the greatest good compatible with the least possible disturbance to the environment.

To achieve this goal, nine policies are stated:

1. To maximize efforts to control and eliminate shoreline pollution—air, water, and land.

2. To restrict mineral extraction or exploration on or adjacent to DuPont's shoreline and the waters of Puget Sound in general.

3. To be concerned with and to seek ways to satisfy the growing need for adequate recreational facilities.

4. To be concerned with and to seek ways *to provide modern competitive marine terminal facilities for world trade* with due concern for the environment.

5. To encourage preservation and enhancement of fish and wildlife in this area for future generations in cooperation with State and Federal agencies.

6. To define all appropriate shoreline uses and to assure that all such uses are compatible with the site, the surrounding area and the environment.

7. To establish and maintain reasonable structural standards for maintenance and development of Du Pont's shoreline.

8. To require that all shoreline uses conform to all applicable federal, state and local laws and regulations relating to environmental quality and resource protection.

9. For that portion of the shoreline that is designated as "Shorelines of Statewide Significance", the following specific policies apply:

a. Recognize and protect the state–wide interest over local interest.

b. Preserve the natural character of the shoreline.

c. Result in long–term over short–term benefit.

d. Protect the resources and ecology of shorelines.

e. Increase public access to publicly owned areas of the shorelines.

f. Increase recreational opportunities for the public on the shorelines.

(Italics ours.)

Reading the general purpose and policies of the DSMP as a whole we are convinced the slight language differences

in the DSMP and the DOE conditional use provisions do not support plaintiffs' position. While the DSMP stresses the vital importance of preserving the environment, it recognizes that some commercial and industrial use of the shoreline is necessary and desirable. A literal interpretation of "no adverse effects" would end *any* development of the DuPont shoreline. The DSMP is an extensive, carefully worded document of 95 pages. It would be wholly unreasonable to read the DSMP language of "no adverse effects" or any other isolated word or phrase in the document so literally as to defeat the overall purpose of the program. We will not do so.

Plaintiffs' counsel at oral argument suggested "the City of DuPont in 1975 took out the word unreasonable and deliberately took it out for reasons of enhanced shoreline protection along these shorelines of the Nisqually Delta." Counsel for DOE, however, more persuasively argued

> the average person on the street, who's not a lawyer, is not used to SEPA litigation, commonly puts a balancing or a judgmental feeling within their description of what they conclude is adverse. They balance the pros and the cons. . . . [T]hat's what the average citizen's advisory person who drafted this language would have meant.

Moreover, a balanced reading of the DSMP is consistent with the SMA, from which DuPont received its authority. The SMA declares it to be the policy of the State to foster "reasonable" uses. While the SMA is concerned with protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, it does not say there can be *no* adverse effects.

One final observation: Plaintiffs choose to emphasize the phrase "no adverse effects on the environment". The DSMP guideline in question, however, reads "[t]he use will cause no adverse effects on the environment *or other uses.*" (Italics ours.) A moment of reflection will make it evident even the position of the plaintiffs, carried to its logical conclusion, violates the guidelines. Any use would be an

adverse effect on the environment but to ban any use would have an adverse effect on "other uses".

We choose to avoid a literal reading of "no adverse effects" as it would lead to an inconsistent and absurd result. Surely those who drafted the guidelines did not contemplate such nonsensical consequences from their work. "The spirit or purpose of an enactment should prevail over the express but inept wording." *State v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981).

## III

### EVIDENTIARY RULING

Plaintiffs assert the SHB erred by admitting into evidence studies and correspondence which represented material in DuPont's records on the Weyco proposal. Several of the studies had been commissioned and paid for by Weyco, specifically for the project. The records were admitted as records kept in the regular course of business of the City. The sponsoring witness was Mark Jackson, DuPont City Planner, who was the custodian of the records.

Plaintiffs argue it was prejudicial error to admit the records under the hearsay exception for business records. RCW 5.45. Plaintiffs contend there is no evidence the records were made "at or near the time of the act, condition or event"; Jackson was not a "qualified witness"; the records were not kept in the "regular course of business"; and the court did not "justify its [the records'] admission." RCW 5.45.020.

■ However, the SHB is not bound to follow the civil rules of evidence. Relevant hearsay evidence is admissible in administrative hearings. Under WAC 461–08–180:

> [A]ll relevant evidence is admissible which, in the opinion of the officer conducting the hearing, is the best evidence reasonably obtainable, having due regard for its necessity, availability and trustworthiness. In passing upon the admissibility of evidence, the officer conducting the hearing shall give consideration to, but shall not be bound to follow, the rules of evidence governing civil

proceedings in matters not involving trial by jury in the superior courts of the state of Washington.

We interpreted a code identical to WAC 461–08–180 in *Chmela v. Department of Motor Vehicles,* 88 Wn.2d 385, 561 P.2d 1085 (1977). There, we recognized that hearsay evidence may be inadmissible in some circumstances because it lacks circumstantial guaranties of trustworthiness. *Chmela,* 88 Wn.2d at 393.

In this case, however, there are circumstances of reliability, and the records appear to have been the "best evidence reasonably obtainable". WAC 461–08–180 confers upon the officer some discretion in making this judgment. The SHB was faced with the task of determining the scope of the original EIS and compliance with the SMA. (The adequacy of the original EIS had already been adjudicated.) The information in the records was essential and far more accessible than were the experts themselves. The supervision of various agencies should be seen as affording some guaranty of trustworthiness to the reports. Additionally, plaintiffs had every opportunity to review the reports and present expert testimony of their own to contradict the reports. In light of all this, the SHB did not abuse its discretion in admitting the records as the "best evidence reasonably obtainable".

We conclude that defendants have made no significant procedural errors. We affirm the decisions of the trial court and SHB. The City of DuPont issued valid substantial development and conditional use permits to Weyco.

BRACHTENBACH, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., and JAMES and THOMPSON, JJ. Pro Tem., concur.

DORE, J. (dissenting)—The majority opinion destroys the intent and purpose of the notice provisions of the State Environmental Policy Act of 1971, RCW 43.21C, the Shoreline Management Act of 1971, RCW 90.58, and approves a proposed project that is contrary to the City of DuPont's shorelines master program.

PROCEDURAL BACKGROUND

This case concerns the application of the Weyerhaeuser Company for a permit to build a large precast concrete dock, causeway, road, and associated developments along the shore of southern Puget Sound in the city of DuPont.

The proposed facility lies within the Nisqually Delta, "[s]horelines of state–wide significance" under RCW 90.58-.030(2)(e)(ii)(A). Shorelines of statewide significance are designated by the Legislature as those shorelines that have special economic, ecological, educational, developmental, recreational, or aesthetic values. RCW 90.58.310. The Nisqually Delta is described by the Shorelines Hearings Board as follows:

> The Nisqually Delta is one of the most biologically productive estuaries in Puget Sound, and is the most productive estuary in southern Puget Sound. Unlike many of the other deltas along Puget Sound, the Nisqually Delta has been little altered since the turn of the century. It is the foremost and best protected in terms of its "integrity" as a delta.
>
> . . .
> The view of the waterfowl and shorebirds from the end of the dike in the NWR has been described as "primeval." The Refuge appears to support wildlife without evidence of human impact. As the seasons come and go, different wildlife activities emerge.
> The Nisqually Delta has been used as a natural laboratory to teach and demonstrate the behavior and survival needs of wildlife.

Clerk's Papers, at 10–11. Directly to the south of this proposed project is the Nisqually National Wildlife Refuge; on the north, Pierce County shorelines with a "conservancy" designation. A conservancy environment designation is for those areas which are intended to maintain their existing character. The objective of a conservancy environment is to protect, conserve and manage existing natural resources and valuable historic and cultural areas in order to ensure a continuous flow of recreational benefits to the public and to achieve sustained resource utilization. WAC 173–16–040(4)(b)(iii).

PHYSICAL SIZE OF DOCK AND SUPPORT AREA

The proposed dock is some 1,470 feet in length, including two "mooring dolphins" on either end. The dock is 140 feet in width and would be supported by 500 to 600 pilings, some of which will extend 100 feet downward from the dock itself. The applicant does not presently propose any cranes or other loading devices on the dock but admits that the dock is designed and engineered to permit their installation at some future date. The dock is built to accommodate single ships up to 1,010 feet in length, or two ships up to 610 feet each.

The dock is accessible from the shore over a causeway some 400 feet in length and 57 feet in width. The causeway is elevated and, like the dock, is supported by pilings.

The causeway is, in turn, connected to an upland staging area by a road which is approximately 3,000 feet in length, and 54 feet in width. It is built through the Sequalitchew Creek gorge.

The upland staging area would provide about 40 acres of storage for finished products and 55 acres for logs. This area would be cleared of vegetation and paved. This staging area will have new road and rail access built to the south toward the main lines of Burlington Northern, Inc. and Interstate 5.

Weyerhaeuser has stated that the purpose of the proposal is to allow it to assemble and load raw and finished forest products. These products will be transferred from the staging area to the dock over the road and causeway by use of large trucks, which will generally resemble logging trucks. During full operation, the dock will be used from 6 a.m. to 10 p.m., about 16 hours a day. If a ship is in port, the logs will be transferred onto the ships by use of ships' cranes. Weyerhaeuser estimates that there will be 2 to 4½ calls per month at the Weyerhaeuser dock. It will take 2 to 5 days to load a vessel, depending on its capacity.

The ramifications of the construction and operation of this facility in such a significant and sensitive environmental region of this state are apparent. The uproar and public

concern over this potential development have twice brought issues, relating to this state's environmental legislation, to this court.

## JUDICIAL HISTORY

In *Nisqually Delta Ass'n v. DuPont*, 95 Wn.2d 563, 627 P.2d 956 (1981), a 5–member majority of this court held that only Weyerhaeuser and Burlington Northern, Inc. (the petitioners of the annexation) had standing to contest the Pierce County Boundary Review Board's approval of annexation of the proposed site of the facility to the City of DuPont. This decision effectively precluded those persons residing near the proposed facility from contesting a significant, integral step toward construction of the project. *Nisqually Delta*, at 573 (Dore, J., dissenting). As a result of that annexation, Weyerhaeuser owns 3,200 acres of the approximately 3,300 acres comprising the city of DuPont.

DuPont's shorelines master program was adopted and approved without comment by the Department of Ecology in June 1975. It was not until 1976 that Weyerhaeuser announced the purchase of the DuPont property and its intention to construct the export facility. It is evident that the citizenry of DuPont did not have in consideration the construction and placement of this substantial project when enacting their shorelines master program and conditional use criteria.

In February 1979, DuPont issued and circulated the final environmental impact statement (FEIS) for the Weyerhaeuser export facility. However, prior to the filing of the required applications for substantial development and conditional use permits, Weyerhaeuser determined to alter and move the facility to a location different from that depicted in the FEIS as the proposed or alternate site. It is this alteration of the proposal and subsequent proceedings that give rise to this appeal.

## NOTICE PROVISIONS

The state environmental policy act's public comment and notice procedures are at the heart of the environmental

review process. The act requires that all responsible opposing viewpoints be given an opportunity to be included in the decisionmaking process. The purpose of notice provisions is to fairly and sufficiently apprise those who may be affected by a proposed action of its nature and character so they may intelligently prepare for the hearing. *Barrie v. Kitsap Cy.*, 84 Wn.2d 579, 585, 527 P.2d 1377 (1974). To preserve the efficacy of the State Environmental Policy Act of 1971, it is necessary that courts demand strict compliance with the disclosure and procedural provisions of the act. Courts must also insist on strict adherence to the regulations through which the act's mandate is administered. This ensures that the governmental body is cognizant of all the environmental trade–offs that are implicit in a decision.

The notice of application for the substantial development and conditional use permits referred the public to the final environmental impact statement for a "complete project description". It is undisputed that the FEIS issued in February 1979 described a "proposed" forest products export facility in a "preferred" location which is substantially different from the approved facility location. The project approved is much closer to the Nisqually National Wildlife Refuge and much farther offshore than the project depicted in the final environmental impact statement. In comparing the two locations, the Shorelines Hearings Board found that there were several disadvantages to the location finally approved compared to that described in the FEIS. The Board said:

> First, it [the permitted dock] extends the dock some 1000 feet closer, about one third of the distance, to the Nisqually National Wildlife Refuge. Second, there will be increased disturbance of sediments during construction, due to thickening of the alluvial deposits at the permitted location. Third, there could be a more profound effect on the delta of Sequalitchew Creek and the important wildlife use of this area but this is difficult to quantify.

Clerk's Papers, at 33.

From the foregoing, it is manifest that the public notice

put the project in the wrong place, and the project described in the notice (similarly described in the FEIS) was a more desirable project than that which was actually considered by the City. Thus, the two dock locations are not equivalent: the new dock location, from the public viewpoint, being inferior to the original project. An accurate description of the proposal undoubtedly would have engendered much greater opposition to this project. The notice issued was misleading; it did not accurately locate the facility that was, in fact, being proposed for approval.

The majority rationalizes this error in notice with a number of fallacious statements, all of which misconstrue applicable law. The majority states that the Shorelines Hearings Board found that there were "no significant differences" shown in the impacts between the facility location described in the FEIS and the location in the application. This hindsight determination by the Board begs the question. The question is whether the notice was defective, and concerned citizens, including the plaintiffs, were, in fact, misled. *Barrie,* at 583. Had the public been accurately informed, they would have had the opportunity to analyze the amended project and to intelligently prepare for, and present evidence at, the hearing. The Board's determination then may well have resulted in a directly opposite decision.

The argument that a recipient of the notice could go to the DuPont City Hall and ascertain for himself the true proposed location of the facility further ignores the realities of the situation. Those interested parties that had previously examined the FEIS which purported to show the proposed location of the facility would have no reason, without a new notice, to expect a different proposal being filed at DuPont City Hall. These concerned citizens would necessarily prepare themselves for a hearing on a proposed location that wasn't pending or, worse, not even attend the proceedings because the facility described in the FEIS tended to be a more acceptable project than that which was being considered by the City.

The State Environmental Policy Act of 1971, RCW 43.21C, and implementing regulations, WAC 197–10–660, address the use of a previously prepared final environmental impact statement for a *new proposed action*. Two alternative ways of using the previous FEIS are permitted: (1) where the new proposed action will have an impact not adequately addressed in the previous FEIS, the agency must prepare a supplement or (2) where the new proposed action will *not* have an impact that is substantially different from the impacts of the earlier proposed action, the agency must send a notice of its intent to use the previous FEIS for the new proposal.

The Washington Administrative Code 197–10–660 provides in full:

(1) An agency may adopt and utilize a previously prepared EIS, or portion thereof, to satisfy certain of the EIS requirements applicable to a different proposed action, as set forth in (2) and (3) below. In such event, two requirements shall be met:

(a) The previous EIS or portion thereof, together with any supplement to it, shall meet the requirements of these guidelines applicable to an EIS for the new proposed action, and

(b) Where any intervening change in conditions would make the previous EIS misleading when applied to the new proposed action, a previous EIS shall not be used without an explanatory supplement.

(2) When the new proposed action will have an impact on the environment that was not adequately analyzed in the previously prepared EIS, the lead agency shall prepare a draft supplemental EIS and comply with the provisions of WAC 197–10–400 through 197–10–695. The contents of the draft and final supplemental EIS shall be limited to those impacts of the proposed action which were not adequately analyzed in the earlier EIS.

(3) When the new proposed action will not have an impact on the environment that is substantially different than the impacts of the earlier proposed action, the lead agency may prepare a written statement setting forth its determination under this subsection and circulate it as provided in WAC 197–10–600. The lead agency shall not be required to prepare a new or supplemental draft or

final EIS on the new proposed action when this subsection is determined to apply. However, the provisions of WAC 197–10–480 through 197–10–490, relating to a public hearing on the environmental impact of a proposal shall apply.

The change in dock location was a *new proposed action*. Three factors support this proposition. First, there were differences between the old and new docks: the new facility was moved much closer to the Nisqually Wildlife Refuge and much farther offshore. Secondly, the dock, in its new location, resulted in different impacts on the environment. Thirdly, the Board concluded that there were measurable differences and detriments connected with the new proposed dock location from that of the old. The weight of the evidence and common sense clearly dictate this change in dock location requires the minimum compliance of sending a written statement under WAC 197–10–660.

WAC 197–10–660(3) allows the use of a previously prepared FEIS for a new proposed action when there are no substantially different impacts in the new proposed action. Where the new proposed action will not have an impact on the environment that is substantially different from the impacts of the earlier proposed action, this section gives the lead agency the discretion to either prepare a supplemental EIS or send the "written statement" of determination of nonsubstantial differences in impacts. The rule is clear that if the notice is not sent, procedural requirements will apply and a supplemental EIS must be prepared. The notice also preserves, as indicated in the third sentence of section 660(3), the right of the public to demand a public hearing on the new proposed action as provided in WAC 197–10–480(2)(b).

Although the Department of Ecology informed DuPont that it did not have to prepare a supplemental EIS, DuPont did not file the notice of intent to use the previous FEIS. A substantially different impact is not required in order for the change in location to be a new proposed action. The EIS process should serve both to alert the pub-

lic of what the agency intends to do and to give the public enough information to be able to participate intelligently in the EIS process. Applied here, this general rule calls for a pragmatic judgment: whether the proposal finally selected by DuPont was within the range of alternatives the public could have reasonably anticipated. Common sense dictates that a proposal which is not the "proposed" or "alternate" action described in the FEIS is a "new proposed action". This is not a burdensome requirement with which to comply. The agency need only send notice that it is going to use a previously prepared FEIS for a proposal that is different from that described in the FEIS but which does not have substantially different impacts. By failing to disclose the change in location of the proposed facility, the City of DuPont insulated its decisionmaking process from public scrutiny.

The respondents failed to give notice that they were using the previous final environmental impact statement for the new proposal and, thus, they should be required to either prepare a supplemental environmental impact statement, or this case should be remanded for the circulation of the required notice.

### THE DUPONT SHORELINES MASTER PROGRAM

The majority cavalierly labels as "slight language differences" the dissimilarity between DuPont's conditional use provisions and the conditional use guidelines proposed by the Department of Ecology (DOE). In fact, there is a substantial difference in the language establishing the criteria for conditional use permits.

In WAC 173-16-070(1), DOE's criteria that "[t]he use will cause no unreasonably adverse effects on the environment or other uses" was changed by the deletion of the word "unreasonably" in DuPont's shorelines master program. Clerk's Papers, at 103. This change results in a wholly different meaning obvious to either a layman or a lawyer.

In subsection (2), DuPont made two changes from the

DOE criteria regarding "interference" with shoreline use. First, DuPont added a colloquial modifier "will in no way interfere" to replace the declarative negative "will not interfere" in the DOE guidelines. Clerk's Papers, at 103. By adding "in no way", DuPont demonstrated a plain intent to strengthen this protection. The term "in no way" conveys the same determination to preserve shoreline values that the removal of "unreasonably" had in the modification to the first of the conditional use criteria. Secondly, the City deleted the word "public" as a modifier of "shoreline". By deleting the term "public", the City extends prohibitions against interference with public use to private, as well as public, shorelines.

In subsection (3), DuPont struck the words "and the master program" from the compatibility requirement. Clerk's Papers, at 103. By removing the words "master program", the City eliminates the DOE suggestion that consistency with the master program be retained in design of the site.

In subsection (4), the City adopted the DOE's suggested language in its entirety. Clerk's Papers, at 103.

DOE adopted these modifications without question or comment when it approved the shorelines master program in June 1975. This is significant in view of the fact that DOE had "full authority" to modify, change or adopt new provisions of conditional uses on these "shorelines of state–wide significance" if the master program "does not provide the optimum implementation of the policy of this chapter to satisfy the state–wide interest." RCW 90.58.090(2). Three other aspects are also significant. First, Weyerhaeuser did not announce its purchase of the DuPont property and intention to construct the facility until a year after adoption of the DuPont shorelines master program. Secondly, no testimony was offered that suggested DuPont made a mistake in adopting its conditional use language. Thirdly, neither the City, Weyerhaeuser nor the Department of Ecology has proposed that the conditional use language be modified. This is significant because both DOE

and the City are mandated to account for changing conditions in master programs in RCW 90.58.190:

> The department [Department of Ecology] and each local government shall periodically review any master programs under its jurisdiction and make such adjustments thereto as are necessary.

The process for changing the master program is straightforward, uncomplicated and capable of expeditious completion. *See* WAC 173–19–060, –070.

From the foregoing, it is evident that the City (with DOE approval) changed the conditional use criteria suggested by the DOE. It is further inescapable that the City made its criteria more restrictive and, therefore, more protective of the environment than the DOE's suggestions.

The master program thus remains both the law of the city and of the state. With the adoption of strict conditional use criteria, DuPont adopted one of the strongest shorelines master programs in the state. It may be inferred that such strict conditional use criteria were adopted due to the statewide significance of the Nisqually Delta and the nature of adjoining shorelines.

At the outset, it is important to note that, without the application of the Board's "reasonableness" standard, the Board would find the development inconsistent with the conditional use criteria. Consider the Board's decision relating to the four conditional use criteria.

First, regarding the question of adverse impacts on the environment, the Board admits that there are adverse effects on the Sequalitchew Creek and on the Nisqually Delta which arise from this proposal. There is no serious argument on this score: the FEIS concludes that there will be a variety of impacts on the environment resulting from the Weyerhaeuser proposal. Some of these are concluded to be moderate to severe, including such matters as aesthetics, light and glare, erosion and noise.

Secondly, the Board does find interference with public use of the shorelines, including public use of the shorelines in the vicinity of the proposed dock, the dock access cause-

way and the access road. Clerk's Papers, at 22. Such interference is obvious: the proposed dock, particularly when large, oceangoing ships are present, will prevent the public from using the water and land areas in and around the dock. Similarly, the construction of a road along Sequalitchew Creek to the dock will obviously interfere with shoreline use.

Thirdly, the Board admits that the design of the site is aesthetically incompatible with the surroundings. The Board said:

Aesthetics presently associated with the Nisqually Delta would be compromised by the activity at the proposed dock. Aesthetic losses and disturbing activity in the waters of Nisqually Reach would tend to move the delta away from its relatively natural condition.

Clerk's Papers, at 35. Again, the Board's conclusion is correct: the dock would be 120 feet wide and 1,555 feet in length (more than a quarter mile) in an area where the only commercial shoreline use is a small, largely unused dock.

The Shorelines Hearings Board conceded that the conditional use criteria language is unambiguous and the majority does not disagree. There is no basis for judicial or administrative interpretation of unambiguous language. The general rule as set forth in 2A C. Sands, *Statutory Construction* § 45.02 (4th ed. 1973) is as follows:

A rule of statutory interpretation which is frequently encountered asserts that a statute which is clear and unambiguous on its face need not and cannot be interpreted by a court and that only those statutes which are of doubtful meaning are subject to the process of statutory interpretation. As declared in a leading case: "Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meanings need no discussion."

(Footnote omitted.)

A similar statement is made at section 46.01 as follows:

"There is no safer nor better settled canon of interpretation than that when language is clear and unambiguous it must be held to mean what it plainly expresses."

The same rule is true in the state of Washington: when the language of a statute or ordinance is clear and unambiguous, there can be only one meaning and there is no room for statutory interpretation. *See Tacoma Telco Fed. Credit Union v. Edwards*, 94 Wn.2d 666, 619 P.2d 363 (1980); *In re Lehman*, 93 Wn.2d 25, 604 P.2d 948 (1980); *McCarver v. Manson Park & Rec. Dist.*, 92 Wn.2d 370, 597 P.2d 1362 (1979); *Thompson v. Lewis Cy.*, 92 Wn.2d 204, 595 P.2d 541 (1979); *Hatfield v. Greco*, 87 Wn.2d 780, 557 P.2d 340 (1976).

Despite the clear language of the conditional use criteria, the majority holds that the Shorelines Hearings Board acted properly in applying a "reasonableness" standard as that applicable to Department of Ecology guidelines. The majority's acquiescence in this interpretation placed words back into the statute which had been deliberately and specifically taken out.

The majority finds that a literal interpretation of the no–adverse–effects language would end any development of the DuPont shoreline, and defeat the overall purpose of the shorelines master program. The majority reasons that strict application of the criteria would mean that nothing would be permitted to be located on the DuPont shoreline, even the most minor uses.

This proposition is, of course, hypothetical and contrary to the present facts. The Weyerhaeuser project is a massive undertaking: the dock is as long as 3½ football fields and has the potential for nearly continuous loading activity from a ship or ships aggregating 1,300 feet or more in length. Indeed, the environmental impact statement for the project identifies serious and substantial environmental effects which will result from the Weyerhaeuser project.

Aside from the hypothetical nature of the majority's argument, there is no support in the record for the proposition that nothing can be built on this shoreline if the conditional use criteria are applied. For the majority to rule that these provisions somehow result in absurd results is to

say that citizen committees and local governments cannot adopt stringent programs to protect the environment. That certainly cannot be the case under the terms of the Shoreline Management Act of 1971. Here, a previous city council chose, on recommendations of a citizens advisory committee, to adopt strong protections for its shorelines. To those concerned with the protection of the Nisqually Delta, this was a considerable victory. However, now the same City (but a different city council) simply ignores what it has written into law and adopts a new standard, all because a certain project has arisen. Merely because Weyerhaeuser now has ownership of 3,200 acres of the approximately 3,300 acres comprising the city of DuPont does not permit the City to ignore the plain language of its own ordinances in order to accommodate the desires of Weyerhaeuser. This is ad hoc decisionmaking, ignoring and contradicting the terms of an adopted local ordinance and approved state regulations. The majority adopts a rule which allows local government to emasculate its own laws by circumvention.

Contrary to the position of the majority, the goals and policies of the DuPont master program support the restrictive conditions of the conditional use criteria. All the policy statements refer specifically to the "preservation" and "enhancement" of natural environment and "elimination" of shoreline pollution. This, combined with the general goal to develop only consistent with the natural resource values and the city's unique aesthetic qualities offered by water, topography, views, and maritime character, indicates that the conditional use criteria are an extension of, not a deviation from, the general goals and policies.

It is true that the Shoreline Management Act of 1971, RCW 90.58, does not purport to prohibit all development on the state's shorelines. But the act, as may be seen from its policies section (RCW 90.58.020), does evidence a strong bias toward a preservation and protection of natural shoreline qualities. Thus, it may be that the act, shorelines master programs or administrative determinations may

prohibit certain uses. It is indeed inherent in any program of control of land uses that from time to time certain uses may be prohibited. *Hayes v. Yount,* 87 Wn.2d 280, 552 P.2d 1038 (1976) (affirmation of Shorelines Hearings Board's denial of a permit for a shoreline sanitary landfill). That this particular proposal may be prohibited does not warrant an interpretation of DuPont's shorelines master program which clearly is in contravention of its intent and meaning.

CONCLUSION

There are a number of substantial defects in the notice requirements for the Weyerhaeuser proposal. First, the statutorily required notice under the Shoreline Management Act of 1971 was false and misleading because it described a dock at a different location than the one proposed. Secondly, respondents did not circulate a written statement disclosing they were using the FEIS on the prior dock location to suffice for an environmental analysis on the new location.

Each one of these items is reversible error in itself because each violates plain, statutory, administrative and case law mandates. It is manifest that the necessary notice provisions for the dock change were grossly inadequate, and reversal on this ground should be mandated.

The City of DuPont adopted a shorelines management program which provides strong protection for the environment and for the preservation of public use of the shorelines, both of which are foundations for the shoreline management act. The Shorelines Hearings Board has emasculated these provisions by its interpretations which fly in the face of the obvious intentions of the City and the Department of Ecology.

In 1971, the Legislature enunciated its policy to protect the environment for the public by legislating RCW 90.58-.020.

It is the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses. This policy

is designed to insure the development of these shorelines in a manner which, while allowing for limited reduction of rights of the public in the navigable waters, will promote and enhance the public interest. This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto.

The legislature declares that the interest of all of the people shall be paramount in the management of shorelines of state–wide significance. The department, in adopting guidelines for shorelines of state–wide significance, and local government, in developing master programs for shorelines of state–wide significance, shall give preference to uses in the following order of preference which:

(1) Recognize and protect the state–wide interest over local interest;

(2) Preserve the natural character of the shoreline;

(3) Result in long term over short term benefit;

(4) Protect the resources and ecology of the shoreline;

(5) Increase public access to publicly owned areas of the shorelines;

(6) Increase recreational opportunities for the public in the shoreline;

(7) Provide for any other element as defined in RCW 90.58.100 deemed appropriate or necessary.

In the implementation of this policy the public's opportunity to enjoy the physical and aesthetic qualities of natural shorelines of the state shall be preserved to the greatest extent feasible consistent with the overall best interest of the state and the people generally. To this end uses shall be preferred which are consistent with control of pollution and prevention of damage to the natural environment, or are unique to or dependent upon use of the state's shoreline.

RCW 90.58.020, in part.

The mighty and majestic Nisqually Delta was designated by the Legislature as "shorelines of state–wide significance", an environmental sanctuary of unparalleled beauty and biological productivity. RCW 90.58.030(2)(e)(ii)(A). The Legislature performed its job well by decreeing a legis-

lative protective net over this priceless heritage. In *Nisqually Delta Ass'n v. DuPont, supra,* and the majority here, however, the Supreme Court has cut the net via unjustified and strained interpretation of law which negates the State's legislative mandate that the interest of all of the people shall be paramount in the management of shorelines of statewide significance.

I would reverse the decision of the Shorelines Hearings Board and remand for proceedings in accordance with provisions of this opinion.

Reconsideration denied May 16, 1985.