FILED
COURT OF APPEALS
DIVISION II

2014 JUL 15 AM 10: 41

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

EDWARD O. GORRE,

    Appellant and
    Cross Respondent,

v.

CITY OF TACOMA,

    Respondent and
    Cross Appellant,

DEPARTMENT OF LABOR AND
INDUSTRIES,

    Respondent.

No. 43621-3-II

ORDER AMENDING ORDER GRANTING
RECONSIDERATION
IN PART AND AMENDING OPINION

The court amends the first and second sentences of the first paragraph of the Order

Granting Reconsideration in Part and Amending Opinion, filed today, July 8, 2014, to correct a

date and to substitute "published" for "unpublished" so that these sentences now read as follows:

> Respondent Department of Labor & Industries (Department) has filed a
> motion for reconsideration of our published opinion filed on April 23, 2014. We
> grant the Department's motion for reconsideration, in part, by making the
> following changes to our published opinion filed April 23, 2014: . . . .

**IT IS SO ORDERED.**

**DATED** this _15th_ day of ___July___, 2014.

_____
Hunt, P.J.

For the Court:
Hunt, P.J., Worswick, J., Penoyar, J.P.T.

FILED
COURT OF APPEALS
DIVISION II
2014 JUL -8 AM 10: 18
STATE OF WASHINGTON
BY_____
DEPUTY

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

EDWARD O. GORRE,

Appellant and
Cross Respondent,

v.

CITY OF TACOMA,

Respondent and
Cross Appellant,

DEPARTMENT OF LABOR AND
INDUSTRIES,

Respondent.

No. 43621-3-II

ORDER GRANTING RECONSIDERATION
IN PART AND AMENDING OPINION

Respondent Department of Labor & Industries (Department) has filed a motion for reconsideration of our published opinion filed on May 7, 2014. We grant the Department's motion for reconsideration, in part, by making the following changes to our unpublished opinion filed April 23, 2014:

(1) On page 3, we modify the first sentence of footnote 3, which reads, "In so doing, we note that the following existing evidence in the record is insufficient to rebut the presumption that Gorre's Valley Fever is an occupational disease under RCW 51.32.185," as follows:

We add the phrase "before us on appeal" after "we note that the following existing evidence"; and we delete the word "is" before "insufficient" and replace "is" with "appears." With these changes, the first sentence of footnote 3 now reads:

> In so doing, we note that the following existing evidence in the record before us on appeal appears insufficient to rebut the presumption that Gorre's Valley Fever is an occupational disease under RCW 51.32.185"

No. 43621-3-II

(2) On page 40, we delete footnote 50, which states:

An administrative court is not bound to follow the civil rules of evidence; on the contrary, relevant hearsay evidence is admissible in administrative hearings. *Nisqually Delta Ass'n v. City of Dupont*, 103 Wn.2d 720, 733, 696 P.2d 1222 (1985); *Pappas v. Emp't Sec. Dept.*, 135 Wn. App. 852, 857, 146 P.3d 1208 (2006); *Hahn v. Dep't of Ret. Sys.*, 137 Wn. App. 933, 942, 155 P.3d 177 (2007). *See also* RCW 34.05.452(1), which summarizes the relaxed evidentiary standards in administrative hearings and broad discretion for the presiding officer.

With these changes, footnote 51 on the following page shall be renumbered to footnote 50.

We otherwise deny the Department's motion for reconsideration.

**IT IS SO ORDERED.**

DATED this 8th day of _____July_____, 2014.

_____
Hunt, P.J.

We concur:

_____
Worswick, J.

_____
Penoyar, J.P.T.

2

FILED
COURT OF APPEALS
DIVISION II

2014 APR 23 PM 3:29

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

EDWARD O. GORRE,

      Appellant and
      Cross Respondent,

v.

CITY OF TACOMA,

      Respondent and
      Cross Appellant,

DEPARTMENT OF LABOR AND
INDUSTRIES,

      Respondent.

No. 43621-3-II

PUBLISHED OPINION

HUNT, J. — Tacoma firefighter Lieutenant Edward O. Gorre appeals the superior court's affirmance of the Board of Industrial Insurance Appeals' denial of his occupational disease claim under RCW 51.32.185[1]. Gorre argues that we should reverse because (1) he had separate diagnoses of "Valley Fever" and eosinophilic lung disease, which qualified for RCW 51.32.185's evidentiary presumption of occupational disease for firefighters; (2) the Board and the Department of Labor and Industries (Department) failed to apply this statutory presumption of occupational disease, which improperly shifted the burden of proof to him (rather than

_____

[1] We acknowledge that at the time Gorre filed his first claim for benefits, April 2007, the 2002 version of RCW 51.32.185 was in effect. Shortly thereafter, the statute was amended in July 2007, adding sections 6 and 7, which discuss the definition of "firefighting activities" and attorney fees, respectively. RCW 51.32.185(6) and (7). Because these 2007 statutory amendments did not substantively affect the legal issues here, we reference the new statute as the parties do in this appeal.

No. 43621-3-II

properly requiring the City of Tacoma to rebut this presumption); and (3) the evidence failed to rebut the presumption that he did not have an occupational disease that arose naturally and proximately from the course of his employment.

The City of Tacoma cross appeals (1) the superior court's finding that Gorre was not a smoker, which would preclude application of the statutory evidentiary presumption; (2) the superior court's consideration of. Gorre's evidence outside the Board's record; and (3) the Board's failure to award the City's deposition costs incurred before the Board.

We reverse the superior court's findings of fact and conclusions of law that (1) Gorre did not have an occupational disease under RCW 51.08.140 based on its improper finding that he failed to prove a specific injury during the course of his employment, (2) Gorre did not contract any respiratory conditions that arose naturally and proximately from distinctive conditions of his employment with the City, and (3) the Board's decision and order are correct; we also reverse the underlying corresponding Board findings. Holding that the superior court did not abuse its discretion in failing to strike Gorre's evidence, we affirm the superior court's finding that Gorre was not a smoker. Further holding that both the Board and the superior court erred in failing to apply RCW 51.32.185's evidentiary presumption of occupational disease to Gorre's claim, (1) we reverse both the Board's denial of Gorre's claim and the superior court's affirmance of the Board's denial[2]; and (2) we remand to the Board with instructions to follow RCW 51.32.185, to

---

[2] Because we reverse and remand, we do not address the City's argument that the superior court abused its discretion in denying the City's request for deposition costs.

2

No. 43621-3-II

accord Gorre the benefit of this presumption, and to shift to the City the burden of rebutting the presumption of occupational disease by a preponderance of the evidence.[3]

FACTS

I. BACKGROUND AND MEDICAL HISTORY

Edward Omar Gorre grew up and lived for 18 years in Fair Oaks, California. After graduating from high school, he attended California colleges. Gorre served in the United States Army in Operation Desert Storm from 1988 to 1990, when he returned to California and lived in Sacramento for four years. In 1997 Gorre moved to the Tacoma area, where he worked as a professional firefighter and firefighter paramedic for the City of Tacoma from March 17, 1997, to May 2007. As a prerequisite for this employment, Gorre passed a demanding test of physical strength and stamina and a physical examination that included blood testing and x-rays. In 2000 he became a firefighter paramedic; in 2007 he became a fire medic lieutenant.

Over the course of his career as a firefighter and paramedic, Gorre responded to thousands of residential, commercial, industrial, and wild fires. His duties also included fire suppression, search and rescue, and "overhaul," which involves looking for seeds of fire to make sure the fire does not start up again. Administrative Record (AR) at 1055. He was exposed to smoke, diesel, chemicals, and mold when responding to fire calls, "Hazmat"[4] calls (hazardous material spills), lockouts (from cars and houses), daily building inspections, car incidents, and

---

[3] In so doing, we note that the following existing evidence in the record is insufficient to rebut the presumption that Gorre's Valley Fever is an occupational disease under RCW 51.32.185: (1) that Valley Fever is not native to western Washington, and (2) that Gorre travelled to Nevada during his employment as a City firefighter.

[4] AR at 1058.

3

medic calls. Such exposures frequently placed him in close contact with patients with fever, H1N1 flu virus[5], and other respiratory diseases. Gorre did not wear respiratory protection when he fought wildfires, inspected manufacturing plants, dug trenches, or responded to medical calls. Similarly, Gorre did not wear a "self-contained breathing apparatus" (SCBA) during overhauls[6]; instead, his face was completely exposed. AR at 1055.

Between 2000 and 2005, Gorre and his colleague, Darrin S. Rivers, travelled to California and Las Vegas several times for vacation, including a trip to Las Vegas in November 2005. Two years later, beginning in February or March 2007, after ten years on the job, Gorre experienced fatigue, night sweats, chills, and joint aches. On April 17, he filed an accident report with the City, stating that during a lung biopsy his physician, Dr. Paul Sandstrom, had found evidence of an inhalation injury. Dr. Sandstrom's biopsy revealed upper lobe pulmonary infiltrates[7] and granulomous lesions[8]. Dr. Sandstrom referred Gorre to Dr. Christopher Goss, a pulmonary specialist, who began treating Gorre on May 2, after his lung biopsy. Dr. Goss initially diagnosed Gorre with hypersensitivity pneumonitis, a respiratory disease, and treated him with steroids; almost a year later, on March 19, 2008, Dr. Goss again saw Gorre and

---

[5] H1N1, also known as the avian flu or swine flu, infects the human upper respiratory tract. *See* http://www.cdc.gov/h1n1flu/qa.htm.

[6] It was not common practice amongst firefighters to wear an SCBA for overhaul; and the City did not require them until 2007.

[7] A "pulmonary infiltrate" is a descriptive term used by radiologists to describe an abnormal density (such as pus or fluid) or infection in the lungs.
*See* http://www.aic.cuhk.edu.hk/web8/Very%20BASIC%20CXR%20lungs.html.

[8] "Granulomous lesions" in the lungs refer to chronic inflammations.
*See* http://www.mrcophth.com/pathology/granuloma.html.

No. 43621-3-II

continued to believe that the respiratory disease affecting Gorre was hypersensitivity pneumonitis.

The next month, in April, Gorre saw a dermatologist, who evaluated a nodular skin lesion on his forehead. Its biopsy showed that Gorre had coccidioidomycosis, also known as "Valley Fever."[9] Dr. Paul Bollyky, from the University of Washington Infectious Diseases Clinic, also diagnosed Gorre with Valley Fever[10] and initiated therapy.

## II. PROCEDURE

### A. Adminsitrative Denial of Industrial Insurance (Workers' Compensation) Benefits

Gorre filed a form with the City reporting his occupational injury; he also filed an application for workers' compensation benefits with the Department of Labor and Industries. He reported that Dr. Sandstrom had "found evidence of [an] inhalation exposure upon biopsy of lungs"[11]; but he did not include medical testimony, doctors' notes, or records to support his claim of inhalation exposure. In the application blank asking for the address where his injury had occurred, Gorre did not specify a location. Gorre also submitted Dr. Peter K. Marsh's evaluation

---

[9] AR at 3.

[10] Valley Fever is caused by Coccidioides immitis, a fungus organism that lives in sterile soil in desert areas such as Mexico, the Sonoran desert and other areas of California and Arizona, Nevada, and other southwestern states. This organism produces spores that become airborne when the soil is disturbed; when inhaled, these spores cause Valley Fever in humans. Symptoms of Valley Fever surface between two to six weeks on average after exposure and include flu like symptoms or a transient lung disease that affect a patient's respiratory functions. Although the medical experts in this case explained that Valley Fever was not endemic to Washington State as of 2010, recent Coccidioides diagnoses have been reported in eastern Washington, and Coccidioides immitis (the fungal cause of Valley Fever) has been recently identified in eastern Washington soil. See April 4, 2014, Seattle & King County Public Health health advisory report (http://www.kingcounty.gov/healthservices/health/communicable/providers.aspx).

[11] AR at 872.

that Gorre had Hepatitis C exposure, which was likely work related. The City requested Gorre's medical report, records, and chart notes from Dr. Sandstrom and Edmonds Family Medicine; but it received no response.

The City denied Gorre's lung disease claim. In February 2008, the Department also denied Gorre's lung disease claim, saying it was not an occupational disease under RCW 51.08.140. Gorre requested reconsideration, asserting that he had eosinophilic pneumonia/hypersensitive pneumonitis, which were lung diseases considered presumptive occupational diseases under RCW 51.32.185(1)(a). On March 26, the Department issued an order stating that the City was responsible for Gorre's Hepatitis C exposure and for Gorre's interstitial lung disease, finding that both hepatitis C[12] and interstitial lung disease were occupational diseases and that the City would pay Gorre all medical and time loss benefits.

In September 2008, the City asked Dr. Garrison Ayars to determine Gorre's condition and to consider the RCW 51.32.185 statutory presumption of occupational disease for firefighters.[13] In October, the City sent Dr. Ayars' evaluation to Dr. Goss, stating that if Dr. Goss did not respond, the City would assume he concurred with Dr. Ayars' evaluation. In March 2009, Dr. Goss responded that he disagreed with Dr. Ayars' evaluation.

---

[12] The next month, however, the Department sent notification that it would be issuing a new order stating that it could not include Gorre's hepatitis C with his lung disease claim.

[13] RCW 51.32.185 creates a presumption of occupational disease for firefighters who have respiratory disease, heart problems, cancer, and infectious diseases. RCW 51.32.185(1). If a firefighter qualifies for this statutory presumption, the burden of proof shifts to the employer to show by a preponderance of the evidence that the firefighter's condition does not qualify as an occupational disease. RCW 51.32.185(1).

On March 24, 2009, the Department (1) cancelled its March 26, 2008 order stating that the City was responsible for Gorre's interstitial lung disease; and (2) instead denied Gorre's claim on grounds that there was no proof of specific injury, his condition was not the result of industrial injury, and his condition was not an occupational disease under RCW 51.08.140.

## B. Appeal to Board of Industrial Insurance Appeals

Gorre appealed to the Board of Industrial Insurance Appeals and moved for summary judgment. He argued that (1) he was entitled to the presumption of occupational disease set forth in RCW 51.32.185; (2) the Department had failed to apply this RCW 51.32.185 presumption of occupational disease; and (3) under RCW 51.32.185, the burdens of proof, production, and persuasion rested on the City. The City responded with declarations from Dr. Emil Bardana, Dr. Ayars, Angela Hardy, Britta Holm, and Jolene Davis, among others.

### 1. Industrial Appeals Judge hearing and ruling

The Board's Industrial Appeals Judge (IAJ) ruled that for the statutory occupational disease presumption to apply, Gorre had to provide at least some supporting medical information or an affidavit from one of his doctors—some evidence other than a mere allegation that he had a lung condition.[14] The IAJ denied Gorre's motion for summary judgment because he had failed to provide such medical evidence to support his motion.

Gorre brought a second motion for summary judgment, this time attaching 39 exhibits, which included a medical report and declaration from Dr. Goss, a copy of Rose Environmental's mold inspection at Gorre's residence, Dr. Royce H. Johnson's deposition, and correspondence

---

[14] Gorre conceded that he had not submitted any affidavits or declarations with his motion for summary judgment.

7

between Gorre and the City. The IAJ ruled that (1) interpretation of RCW 51.32.185 was a matter of first impression, (2) whether Valley Fever is a respiratory disease or infectious disease is a question of fact, and (3) the Department had acted appropriately and had "correctly applied the presumption"[15] because "Valley [F]ever is not enumerated in the statute."[16] Administrative Report of Proceedings (ARP) (Mar. 8, 2010) at 88834. Instead of applying the statutory presumption of disease for firefighters, RCW 51.32.185, the IAJ elected to treat Gorre's case as a "normal"[17] occupational disease claim under RCW 51.08.140; this election shifted to Gorre the burden of proving that during the course of his employment he had suffered an occupational exposure that caused his Valley Fever. The IAJ held hearings in June and July 2010.

(a) Gorre's deponents

<u>Dr. Christopher H. Goss</u> (deposed May 6, 2010)

Dr. Goss, a University of Washington associate professor of medicine and an adjunct associate professor of pediatrics, is board certified in pulmonary medicine; he specializes in pulmonary and critical care, and pediatrics. He began treating Gorre in May 2007, after Dr. Sandstrom referred Gorre for a review of Gorre's lung biopsy and for an opinion on the possible etiology of Gorre's eosinophilic lung disease.[18] Gorre first reported symptoms of fevers,

---

[15] Administrative Report of Proceedings (ARP) (Mar. 8, 2010) at 88835.

[16] The Department never issued a ruling under RCW 51.32.185.

[17] ARP (Mar. 8, 2010) at 88835.

[18] We note that the IAJ decision and Board decision refer to the depositions and declarations of Dr. Goss, Dr. Paul Bollyky, and Dr. Johnson as "testimony" and state that they "testified." But the transcript does not reflect that they gave live testimony at the hearing in lieu of or in addition to their deposition testimonies and declarations. *See* AR at 122-23.

8

dyspnea, an abnormal chest x-ray, an abnormal chest computerized tomography (CT) scan, and a positive response to antibodies in his serum. Dr. Goss interpreted Gorre's biopsy report as consistent with hypersensitivity pneumonitis, a lung disease that qualified as a respiratory disease in patients sensitive to aeroallergens.

At the time Dr. Goss treated Gorre, Gorre had a bump that was not biopsied until months later, which later developed into Valley Fever. Dr. Goss hypothesized that Gorre had developed two diseases: (1) initially, eosinophilic lung disease, likely contracted from exposure to aerosolized dust from his fire fighting duties; and (2) Valley Fever, likely contracted as a youth in California and lying dormant/without symptoms but later disseminated by the steroids used to treat Gorre's eosinophilic lung disease. Dr. Goss defined "eosinophilic lung disease" as a broad category of lung diseases that present with pulmonary infiltrates and eosinophils (a specific kind of white blood cell); Dr. Goss stated that eosinophilic lung disease is a respiratory disease. Administrative Record Exhibits (ARE) at 18877.

Dr. Goss further opined that more probably than not, Gorre's initial lung condition related to his employment as a firefighter, and that Gorre did not contract Valley Fever in Washington state. Dr. Goss referred Gorre to the University of Washington's Infectious Diseases Clinic for Valley Fever treatment.

Dr. Royce H. Johnson (deposed January 7, 2010)

Dr. Johnson, a licensed medical doctor since 1971 and board certified since 1974, was Chief of Infectious Diseases and Chair of the Department of Medicine at California's Kern Faculty Medical Group and Kern Medical Center. He ran a large Valley Fever (coccidioidomycosis) clinic in California; and he has published papers and book chapters and

lectured extensively on Valley Fever. Dr. Johnson opined that Valley Fever is transmitted through inhalation exposure to arthroconidia (fungal spores) in the soil, which can travel up to 75 miles; arthroconidis "set up housekeeping" in the lungs and usually cause pneumonic disease, sometimes eosinophilic lung disease. AR at 1164. Valley Fever symptoms take about two to six weeks to appear from the time of exposure. According to Dr. Johnson, Valley Fever occurs throughout the southwest United States, northwest Mexico, Central America, and in South America, not anywhere outside the western hemisphere, and in general not as far north as the state of Washington.

When he treated Gorre in January 21, 2009,[19] Dr. Johnson did not agree with Dr. Goss's theory that Gorre's ingestion of steroids during his eosinophilia treatment had disseminated a dormant cocci organism; instead, it was the other way around—the cocci had caused the pneumonia with eosinophilia to develop. Nevertheless, Dr. Johnson opined that, more likely than not, Gorre had acquired Valley Fever as part of work activity with the City of Tacoma Fire Department, notably when dealing with fires and vehicle problems on I-5. Dr. Johnson further opined that even though Valley Fever is not endemic to Washington, it is possible for cocci spore to spread through importation of substances into Washington.

(b) Gorre's witnesses

Gorre

Gorre testified that during his career as a City firefighter and emergency medic, he responded to about 3,000 residential fires and engaged in various activities such as pulling down

---

[19] Dr. Johnson did not have Gorre's medical records before Dr. Ayars' September 3, 2008 report.

10

ceilings, ripping out walls, and crawling through and moving furniture looking for fire survivors. He had also responded to about 600 industrial fires and 2,500 vehicle, dumpster, electrical, and hazardous fires; and he had encountered 6,000 exposures to chemicals and 15,000 exposures to diesel fumes. Most of the time, he, like the other firefighters, did not wear a self-contained breathing apparatus (SCBA), which directly exposed him to smoke, fumes, and toxic substances. Gorre similarly lacked respiratory protection when (1) entering houses containing cat and human feces; (2) responding to calls in nursing homes, where he had close contact with patients with respiratory diseases; (3) inspecting chicken processing plants, where he was exposed to chicken feathers and droppings; (4) inspecting wood manufacturing plants filled with sawdust; (5) deep trenching into soils to set up rigging systems; and (6) fighting wildfires.

Gorre's fire fighting job with the City also required him to dig foundations for rescue operations at construction sites. He frequently responded to multiple casualty incidents on the main I-5 corridor, rescuing and assessing victims and suppressing tractor trailer fires; these freeway calls exposed him to blood, muck, dirt, diesel exhaust, and brake dust. Gorre was also exposed to various molds: There was green mold growing around the windows and covering the air conditioner filters at the fire station where he worked; he was also exposed to mold and different mushroom spores of mushrooms growing on walls at various houses to which he was called for emergency response. Gorre further testified that he was not a smoker. Gorre had tried a cigarette once in fourth grade and in high school, smoked cigars on special occasions, and chewed tobacco when he played baseball.

11

No. 43621-3-II

## Darrin S. Rivers

Rivers had worked for the City as Gorre's Emergency Medical Technician partner. He testified that off duty, he and Gorre had travelled to California and Nevada several times between 2000 to 2005, and that they had made a couple houseboat trips to Lake Shasta in 2000 and 2001 and a couple trips to Las Vegas to play golf.

Rivers testified that in their line of work, firefighters are exposed to all forms of particulates from residential and commercial fires. When responding to house fires, firefighter paramedics are exposed to smoke from combustion products, such as wood and wood frames, and toxic chemicals from the burning of couches, polyesters, clothing, carpet, and drapes. Depending on the type of structure or business, commercial fires expose firefighters to chemicals, acetones, and paints, among other products of combustion. For example, as a firefighter, Rivers had been exposed to animal feces all over the floors, mold and fungi growing on carpets, and hazardous material spills. Firefighters do not always wear SCBA. For example, it was common practice for firefighters not to wear SCBA when responding to medical calls or when tearing out ceilings to look for small hidden fires during an overhaul. Even if a firefighter wears SCBA, after taking it off, the firefighter still exposes himself to soot and products of combustion that linger on helmets and bunker gear.

When responding to emergency medical service calls, firefighters come in close contact with patients who have respiratory infections and with infectious bacteriological or viral disease processes. When responding to freeway collisions, firefighters are exposed to fuel and other spills, antifreeze, and materials blown by freeway speed traffic.

12

### Glen Zatterberg

Zatterberg, a City firefighter, testified that firefighters were exposed to mold in various circumstances at "Station No. 9"[20] where Gorre worked: (1) Station 9 had aluminum windows that collected condensation, and mold would be found around those windows; and (2) Station 9 also had in-window air conditioning units, whose filters were not cleaned regularly and which developed mold problems. Firefighters were also exposed to inhaling diesel exhaust and house fires. During initial deployment, firefighters would not wear SCBA until they entered a building's interior. And before 2007, firefighters were not required to wear SCBA when removing ceilings and looking for places with hidden fires during overhauls.

### Matthew Simmons

Simmons, an employee of Rural Metro Ambulance, testified that he had been on numerous calls with Gorre. Simmons described the sick patients and poor conditions of residences that Gorre and Simmons faced in their line of work. Simmons mentioned he had similar respiratory symptoms and health problems, but the Board disallowed this specific testimony about Simmons' health conditions.

#### (c) City's deponent and witnesses

### Dr. Paul Laszlo Bollyky (deposed June 25, 2010)

Dr. Bollyky is a physician researcher at the Benaroya Research Institute and an infectious disease doctor at the University of Washington. He stated that (1) most people with Valley Fever end up contracting the flu or a transient lung disease that rarely requires any therapy, and (2) there was no way to tell where and how a patient had acquired Valley Fever. Dr. Bollyky

---

[20] ARP (June 7, 2010) at 88133.

13

treated Gorre after his biopsy tested positive for Valley Fever. When he wrote Gorre's medical report in March 2009, Gorre's Valley Fever diagnosis was uncontroverted and it was Valley Fever that probably caused the symptoms that Gorre's doctors initially diagnosed. Dr. Bollyky further opined it was unlikely that steroid injections could disseminate Valley Fever, that Valley Fever was not endemic to western Washington, that all his Valley Fever patients had either travelled to or migrated from a Valley Fever endemic area, and that in light of Gorre's having lived in California and traveled to places where coccidioidomycosis was endemic, the most likely probability was that he had acquired Valley Fever in those places.

### Dr. Garrison H. Ayars

Dr. Ayars, an allergy and immunology physician, testified that Valley Fever is endemic to the Sonoran desert, California, southern Nevada, Arizona, New Mexico, and Texas. He described Valley Fever symptoms as pulmonary symptoms that generally occur within one to three weeks of exposure, but which do not surface until years later for some individuals. Although not personally aware of any Valley Fever cases in Washington state, he had reviewed department of health records reporting that there were 15 Valley Fever cases in Washington within a ten-year period, the majority of which had involved Valley Fever acquired outside Washington.

Dr. Ayars started treating Gorre in September 2008, at which time he had Gorre's medical records from Drs. Goss and Johnson, plus Gorre's records from Edmonds Family Medicine, Tacoma General, Lakeshore Clinic, University of Washington, and the Skin Cancer Clinic of Seattle. Dr. Ayars felt that Gorre had no acute significant inhalation exposure or lung injury. Dr. Ayars disagreed with Dr. Goss's opinion that Gorre's ingestion of treatment steroids

No. 43621-3-II

had caused his Valley Fever to disseminate; Dr. Ayers based this opinion on Gorre's Valley Fever symptoms, such as skin problems, that do not happen with eosinophilia. Dr. Ayars opined that (1) Gorre had only one diagnosis, Valley Fever, and no separate independent respiratory disease; (2) Gorre did not contract Valley Fever in Washington; (3) Gorre's having lived in California from 1994 to 1997 and travels all over California since that time provided significant exposure to the Valley Fever organism in an endemic area; and (4) Gorre's symptom onset in February 2006 suggested he had been exposed to the Valley Fever spores when he was in Las Vegas in December 2005 and, thus, it was likely he had contracted Valley Fever in Nevada and had brought it with him to Washington.

### Dr. Emil J. Bardana, Jr.

Dr. Bardana is a physician and allergist with a research background in occupational resin exposure and causation issues. In September 2009 he reviewed Gorre's medical reports and letters from Dr. Ayars and Dr. Goss; Dr. Bardana issued a report in October. He testified that there is no such thing as an eosinophilic lung disease, which is an ambiguous term for a group of disorders that have eosinophilic lung inflammation, not a specific disease. He further testified that eosinophilic lung disease in firefighters is almost a non-issue, and hypothesized that Gorre had developed pulmonary eosinophilic syndrome as a result of his Valley Fever, likely contracted during his golf trip to Las Vegas.

Dr. Bardana testified that Valley Fever, a fungal infection, is endemic in the southwestern part of the United States, Nevada, Utah, New Mexico, and Texas. He opined that (1) Gorre did not have separate and distinct respiratory diseases or conditions apart from Valley Fever symptoms; and (2) given that Gorre had been in Las Vegas in October 2005 and developed

15

No. 43621-3-II

symptoms of Valley Fever starting in December 2005, his trip to Las Vegas could have been his primary exposure to Valley Fever. Dr. Bardana further noted that Gorre's medical records showed that, despite a chewing tobacco history, Gorre's exposure to tobacco had been minimal.

### Dr. Payam Fallah Moghadam

Mycologist Dr. Fallah testified that the Valley Fever organism exists in sterile soil; he opined that it is confined to places such as the lower Sonoran desert, Utah, southern Utah, Nevada, southern Nevada, New Mexico, Arizona, Texas, and the San Diego/Mexico border. He further testified that this organism (1) does not exist in the fertile soil of western Washington; (2) cannot be found in Pierce County, anywhere along the I-5 corridor, or in western Washington grasslands and wildlands; and (3) cannot withstand fire, and will die off at 125 to 130 degrees fahrenheit.

### Dr. Marcia J. Goldoft

Washington State Department of Health epidemiologist Dr. Goldoft testified that she tracks "notifiable" conditions[21] of infectious or communicable diseases in Washington State, that Valley Fever is not a "notifiable" condition in Washington State, and that Valley Fever is not even "classified" by our state Department of Health because it is rare in Washington. ARP (June 24, 2010) at 88536. From 1997 to 2009, there were 15 reported cases of Valley Fever in Washington, reported as "rare diseases" to the Department of Health, with none confirmed as originating from exposures in Washington State. ARP (June 24, 2010) at 88536.

---

[21] "Notifiable" conditions are those that require reporting under the Washington Administrative Code. ARP (June 24, 2010) at 88535.

16

No. 43621-3-II

### Drs. Buckley Allan Eckert and Stuart Mark Weinstein

Dr. Eckert, an internal medicine physician, testified that he had evaluated Gorre on March 8, 2007. At the time, Gorre had night sweats, periodic bouts of fever, Coxsackievirus[22], and bilateral finger numbness. Dr. Eckert also testified that Gorre was a former smoker, who had quit smoking in 1990. Dr. Weinstein, a Harborview Medical Center physician, testified that he had evaluated Gorre on April 18, 2002. At that time, Gorre said he had been a non-smoker since age 30, when he quit smoking cigars, which he had begun at age 20.

### (d) IAJ's ruling

The IAJ issued a proposed decision and order affirming the Department's March 2009 denial of Gorre's claim. Specifically, the IAJ made the following findings of fact, summarized as follows: (1) In February 2006, Gorre developed symptoms of, and his doctor later diagnosed him with an infectious disease, Valley Fever, and Gorre did not develop a respiratory disease or a lung condition; and (2) Gorre's Valley Fever did not arise naturally and proximately from his occupation as a firefighter for the City. Based on these findings, the IAJ issued the following conclusions of law, summarized as follows: (1) Gorre did not incur any disease that arose naturally and proximately from distinctive conditions of his employment with the City's fire department under RCW 51.08.140, and (2) the Department's March 24, 2009 order was correct.

---

[22] Coxsackievirus is a group of viruses responsible for a variety of diseases in humans, such as human herpangina, hand-foot-and-mouth disease, epidemic pleurodynia, and aseptic meningitis. *See* STEDMAN'S MEDICAL DICTIONARY 406 (26th Ed. 1995).

17

## 2. Board's ruling on appeal

Gorre petitioned the Board to review (1) the IAJ's ruling that he had not suffered a respiratory disease under RCW 51.32.185; (2) the IAJ's ruling that the burden of proof was on him (Gorre) to show an occupational relationship between his disease and his job; (3) the IAJ's ruling that he did not suffer an occupational disease, even though he showed he had two respiratory diseases, eosinophilia and coccidioidomycosis (Valley Fever); (4) the IAJ's failure to apply the RCW 51.32.185 presumption of occupational disease, and (5) the IAJ's rulings that he did not develop any respiratory or infectious diseases in the workplace. The City cross-petitioned the Board (1) to review the IAJ's failure to issue a finding or a conclusion that Valley Fever is not a condition subject to RCW 51.32.185's statutory presumption; and (2) to issue a finding or conclusion that the City had rebutted this presumption, even if RCW 51.32.185 did apply.

The Board reviewed the IAJ's record of proceedings, concluded that the IAJ did not commit any prejudicial error, affirmed the IAJ's rulings, and added findings of fact and conclusions of law to clarify why Gorre's medical condition could not be presumed to be an occupational disease under RCW 51.32.185 and to explain why Gorre did not satisfy his burden of proof. The Board made the following findings of fact, summarized as follows: (1) Gorre's exposure to the Valley Fever organism occurred during a November 2005 golfing trip to Nevada, (2) Valley Fever is an infectious disease, (3) Gorre became symptomatic of Valley Fever in December 2005, and (4) Gorre did not contract any respiratory condition naturally and proximately caused by his occupation as a firefighter for the City of Tacoma. Based on these findings, the Board made the following conclusions of law, summarized as follows: (1) during

18

the course of his employment with the City, Gorre did not develop any disabling medical condition that the provisions of RCW 51.32.185 mandate be presumed to be an occupational disease, (2) Gorre did not incur any disease that arose naturally and proximately from distinctive conditions of his employment with the City, (3) the Department's March 24, 2009 order was correct. Ruling that Gorre had not met these burdens, the Board affirmed the Department's order denying Gorre's occupational disease claim.

## C. Appeal to Superior Court

Gorre appealed the Board's decision and order to superior court, where he moved for summary judgment reversal of the Board's rulings. Gorre argued that the Board had failed (1) to apply the RCW 51.32.185 presumptions of firefighter occupational respiratory disease and infectious disease to his medical claims; and (2) to require the City to rebut these presumptions by a preponderance of credible, admissible evidence that his medical conditions did not arise from occupational exposure or from occupational aggravation of any preexisting condition.

The City filed a cross motion for summary judgment, arguing that (1) Gorre failed to establish a compensable claim under RCW 51.32.185; (2) under RCW 51.32.185, Valley Fever is not a presumptive occupational disease and, thus, the superior court should affirm the Board's ruling; (3) RCW 51.32.185 was also inapplicable because Gorre had a smoking history; (4) even if the statutory presumption applied, the City had rebutted it; and (5) Gorre's conditions did not arise naturally and proximately from conditions of his employment with the City.

Gorre then submitted the following exhibits: Rose Environmental's residential indoor environmental quality and mold evaluation, Dr. Goss's declaration, and Dr. Bollyky's letter. The City filed a motion to strike these exhibits and Gorre's reference to Simmons' testimony, arguing

19

that the superior court should prohibit Gorre from offering new exhibits and inadmissible testimony under RCW 51.52.115.[23] Gorre responded that (1) he had already submitted the Rose Environmental report to the Board; (2) Dr. Goss's declaration was already included as an exhibit in Gorre's renewed motion for summary judgment before the Board; (3) Dr. Bollyky had previously testified about the aforementioned letter and its contents during his deposition, which was part of the record; and (4) Simmons' testimony was admissible.

The superior court orally affirmed the Board's decision,[24] ruling that (1) it was "a little hard to support factually"[25] that Gorre had contracted Valley Fever in Washington; (2) Gorre did not have separate diseases of eosinophilia and interstitial lung disease because "what people were seeing were symptoms of the cocci that he did have"; and (3) Gorre was not a smoker—"[h]is testimony was that he smoked a little bit as a kid and had an occasional cigar. I don't think smoking was an issue here at all." Verbatim Transcript of Proceedings (VTP) (Mar. 30, 2012) at 55, 56. The superior court denied the City's request for deposition costs incurred at the Board level, finding that the City had incurred these costs for the Board action, not for the superior court action.

---

[23] When the City asked the superior court to rule on its motion to strike Gorre's exhibits, Gorre voluntarily withdrew Dr. Bollyky's letter. The court stated it would rule on the motion to strike later, but it never did.

[24] The record does not show that the superior court ruled expressly on the parties' cross motions for summary judgment. Instead, it appears that the superior court followed the legislature's statutorily prescribed procedures for judicial review of administrative workers' compensation decisions, which we describe more fully in the standard of review section of this opinion's analysis section.

[25] Verbatim Transcript of Proceedings (VTP) (Mar. 30, 2012) at 54.

No. 43621-3-II

Ruling that a preponderance of the evidence supported the Board's findings of fact, the superior court issued a written ruling adopting the Board's findings of fact and conclusions of law and affirming the Board's denial of Gorre's occupational disease claim. The superior court entered additional findings of fact that Gorre was not a smoker, that he had coccidioidomycosis, that his symptoms were manifestations of his coccidioidomycosis, and that he did not have separate diseases of eosinophilia or interstitial lung disease. The superior court ordered Gorre to pay statutory attorney fees of $200 each to the City and to the Department under RCW 4.84.080, but it denied the City's request for deposition costs.

### D. Appeal to Court of Appeals

Gorre appeals the superior court's rulings and affirmance of the Board's denial of his occupational disease claim. In particular he challenges the superior court's and the Board's failures (1) to recognize three separate statutorily presumptive occupational respiratory conditions; (2) to exclude prejudicial, confusing, and misleading evidence; and (3) to award him attorney fees and costs, including expert witness fees. The City cross-appeals the superior court's failure (1) to find that Gorre was a smoker, (2) to award the City deposition costs under RCW 4.84.010 and RCW 4.84.090[26], and (3) to rule on City's motion to strike and to exclude inadmissible documents and unsupported assertions.

---

[26] The legislature amended RCW 4.84.010 in 2007 and 2009; and amended RCW 4.84.090 in 2011. The amendments did not alter the statutes in any way relevant to this case; accordingly, we cite the current version of the statute.

21

No. 43621-3-II

## ANALYSIS

Gorre argues that the superior court and the Board erred in (1) failing to apply RCW 51.32.185's presumption that firefighters' respiratory and infectious diseases are prima facie occupational diseases under RCW 51.08.140[27]; and (2) consequently, failing to place on the City the burden of rebutting this presumption. The City and Department respond that Gorre had only Valley Fever and no other separate disease and, thus, the superior court did not err in finding that he did not qualify for this evidentiary presumption of occupational disease under RCW 51.32.185.

On cross appeal, the City argues that the superior court erred in (1) finding that Gorre was not a smoker, (2) failing to strike the evidence Gorre presented at the superior court level, and (3) failing to award the City its deposition costs. Gorre responds that the superior court did not err in (1) finding that he was not a smoker, because the record does not support such a finding; (2) failing to grant the City's motion to strike evidence Gorre presented at the superior court level; and (3) denying the City statutory fees for deposition costs it incurred for the Board action. Except for those we can combine, we address each argument in turn.

### I. STANDARD OF REVIEW

Unlike other administrative decisions, the legislature has charged the courts with reviewing workers' compensation cases "as in other civil cases." RCW 51.52.140. As Division One has clarified:

---

[27] More specifically, Gorre asserts that he had separate diseases, Valley Fever and eosinophilia/interstitial lung disease, both of which constitute respiratory and infectious diseases qualifying for this presumption.

22

No. 43621-3-II

Washington's Industrial Insurance Act includes judicial review provisions that are specific to workers' compensation determinations. In particular, the act provides that superior court review of a Board determination is de novo, that it includes the right to a jury trial, and that *the party seeking review bears the burden of showing that the Board's decision was improper*:

The hearing in the superior court shall be de novo, but the court shall not receive evidence or testimony other than, or in addition to, that offered before the board or included in the record filed by the board in the superior court as provided in RCW 51.52.110. . . . In all court proceedings under or pursuant to this title *the findings and decision of the board shall be prima facie correct* and the burden of proof shall be upon the party attacking the same. If the court shall determine that the board has acted within its power and has correctly construed the law and found the facts, the decision of the board shall be confirmed; otherwise, it shall be reversed or modified.

*Rogers v. Dep't of Labor & Indus.*, 151 Wn. App. 174, 179, 210 P.3d 355 (emphasis added) (quoting RCW 51.52.115), *review denied*, 167 Wn.2d 1015 (2009).

Applying these statutory standards, the superior court treats the Board's decision as "prima facie correct under RCW 51.52.115" such that it "may substitute its own findings and decision for the Board's only if it finds from a fair preponderance of credible evidence, that the Board's findings and decision are incorrect." *Rogers*, 151 Wn. App. at 180 (citing *Ruse v. Dep't of Labor & Indus.*, 138 Wn.2d 1, 5, 977 P.2d 570 (1999)). On appeal of the superior court's worker's compensation decision, however,

"[w]e review whether *substantial evidence* supports the trial court's factual findings and then review, de novo, whether the trial court's conclusions of law flow from the findings."

*Rogers*, 151 Wn. App. at 180 (emphasis added) (quoting *Watson v. Dep't of Labor & Indus.*, 133

23

No. 43621-3-II

Wn. App. 903, 909, 138 P.3d 177 (2006) (citing *Ruse*, 138 Wn.2d at 5).[28] In so doing, we also review de novo the legality of the Board's decisions, like the superior court, relying solely on the evidence presented to the Board. RCW 51.52.115; *Raum v. City of Bellevue*, 171 Wn. App. 124, 139, 286 P.3d 695 (2012), *review denied*, 176 Wn.2d 1024 (2013); *Dep't of Labor & Indus. v. Avundes*, 95 Wn. App. 265, 269-70, 976 P.2d 637 (1999), *aff'd*, 140 Wn.2d 282, 966 P.2d 593 (2000).

---

[28] As Division One further explained:

> This statutory review scheme results in a different role for the Court of Appeals than is typical for appeals of administrative decisions pursuant to, for example, the Administrative Procedure Act [ch. 34.05 RCW], where we sit in the same position as the superior court. To be clear, unlike in those cases, our review in workers' compensation cases is akin to our review of any other superior court trial judgment: "'review is limited to examination of the record to see whether substantial evidence supports the findings made after the superior court's de novo review, and whether the court's conclusions of law flow from the findings.'"

*Ruse*, 138 Wn.2d at 5 (quoting *Young v. Dep't of Labor & Indus.*, 81 Wn. App. 123, 128, 913 P.2d 402 (1996)). . . .

> Our function is to review for sufficient or substantial evidence, taking the record in the light most favorable to the party who prevailed in superior court. We are not to reweigh or rebalance the competing testimony and inferences, or to apply anew the burden of persuasion, for doing that would abridge the right to trial by jury.

*Harrison Mem'l Hosp. v. Gagnon*, 110 Wn. App. 475, 485, 40 P.3d 1221 (2002) (footnotes omitted). The Industrial Insurance Act itself encapsulates this rationale, providing that "[a]ppeal shall lie from the judgment of the superior court *as in other civil cases*." RCW 51.52.140 (emphasis added). . . . We do not review the trial court's factual determinations de novo.

*Rogers*, 151 Wn. App. at 180-181 (internal footnotes omitted).

24

## II. GORRE'S VALLEY FEVER: QUALIFYING DISEASE FOR RCW 51.32.185 PRESUMPTION[29]

We agree with Gorre that (1) his contracting Valley Fever was a "respiratory disease," which qualifies for the statutory presumption of an "occupational disease" under RCW 51.32.185; (2) the Department, the IAJ, the Board, and the superior court all erred in failing to apply this statutory presumption to his worker's compensation claim; and (3) consequently, they erred in placing the burden on Gorre to prove his occupational disease instead of placing the burden on the City to rebut this statutory presumption.

### A. RCW 51.32.185: Occupational Disease Presumption for Firefighters

We recognize that generally, in order to obtain workers' compensation benefits, the initial burden is on the worker to show that he or she developed an "occupational disease" that arose naturally and proximately out of employment. RCW 51.08.140; *Ruse*, 138 Wn.2d at 6. But our legislature carved out a unique exception for firefighters when it enacted RCW 51.32.185, which establishes a rebuttable evidentiary presumption that certain diseases contracted by firefighters are "occupational diseases" covered under the Industrial Insurance Act[30]. RCW 51.32.185 (1):

> In the case of firefighters as defined in [former] RCW 41.26.030(4) (a),
> (b), and (c) [(2009)] who are covered under Title 51 RCW . . . , there shall exist a

---

[29] Gorre appears to argue that RCW 51.32.185 creates a separate claim for an occupational disease other than those that the statute lists as recognized firefighter occupational diseases. We disagree. RCW 51.32.185(1) does not create a new cause of action; rather, it creates a rebuttable evidentiary "presumption" that specified firefighter diseases are "occupational" diseases for workers' compensation purposes. *See, e.g., Raum*, 171 Wn. App. at 144. Instead, we agree with Division One of our court, which reviewed the legislative history behind RCW 51.32.185 and held that it does not create a separate occupational disease claim different from that in RCW 51.08.140; instead, "RCW 51.32.185 does [no] more than create a rebuttable evidentiary presumption." *Raum*, 171 Wn. App. at 144.

[30] Title 51 RCW.

No. 43621-3-II

prima facie presumption that: (a) Respiratory disease[31]; . . . and (d) infectious diseases[32] are occupational diseases under RCW 51.08.140[33]. This *presumption of occupational disease* may be rebutted by a preponderance of the evidence. Such evidence may include, but is not limited to, use of tobacco products[34], physical fitness and weight, lifestyle, hereditary factors, and exposure from other employment or nonemployment activities.

---

[31] The legislature accompanied its 1987 promulgation of this evidentiary presumption with the following findings:

> The legislature finds that the employment of fire fighters exposes them to smoke, fumes, and toxic or chemical substances. The legislature recognizes that fire fighters as a class have a higher rate of respiratory disease than the general public. The legislature therefore finds that respiratory disease should be presumed to be occupationally related for industrial insurance purposes for fire fighters.

LAWS OF 1987, ch. 515, § 1

[32] RCW 51.32.185(4) provides:

> The presumption established in subsection (1)(d) of this section *shall be extended* to any firefighter who has contracted any of the following infectious diseases: Human immunodeficiency virus/acquired immunodeficiency syndrome, all strains of hepatitis, meningococcal meningitis, or mycobacterium tuberculosis.

(Emphasis added.)

[33] As is the case for any workers' compensation claim, RCW 51.08.140 defines "[o]ccupational disease" as "such disease or infection as arises naturally and proximately out of employment under the mandatory or elective adoption provisions of this title." RCW 51.32.185, however, shifts the burden of disproving such occupational disease to the employer once the firefighter shows that he has a respiratory, infectious, or other qualifying disease under this statute.

[34] RCW 51.32.185(5) further provides:

> Beginning July 1, 2003, this section does not apply to a firefighter who develops a heart or lung condition and who is a regular user of tobacco products or who has a history of tobacco use. The department, using existing medical research, shall define in rule the extent of tobacco use that shall exclude a firefighter from the provisions of this section.

26

(Emphasis added).[35] For purposes of the instant appeal, we focus on only the respiratory and infectious occupational diseases that Gorre claims he suffered in the course of his employment as a City firefighter.

For the RCW 51.32.185(1) presumption of occupational disease to apply, the firefighter must show that he has one of the four categories of diseases listed in the same statutory subsection.[36] *Raum*, 171 Wn. App. at 147; WAC 296-14-310. Only two of these categories are at issue here: respiratory diseases and infectious diseases. Under the plain language of the RCW 51.32.185(1), once the firefighter shows that he has one of these types of diseases, triggering the statutory presumption that the disease is an "occupational disease," the burden shifts to the employer to rebut the presumption by a preponderance of the evidence by showing that the origin or aggravator of the firefighter's disease did not arise naturally and proximately out of his employment. *Raum*, 171 Wn. App at 141 (citing RCW 51.32.185(1)). If the employer cannot meet this burden, for example, if the cause of the disease cannot be identified by a preponderance of the evidence or even if there is no known association between the disease and firefighting, the

---

[35] This statutory presumption furthers the legislature's intent that the Industrial Insurance Act be remedial in nature and "'reduc[e] to a minimum the suffering and economic loss arising from injuries and/or death occurring in the course of employment.'" *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 474, 745 P.2d 1295 (1987) (quoting RCW 51.12.010).

[36] If the firefighter has some other type of disease, such that this evidentiary presumption does not apply, the burden of proof is on him to prove that the disabling condition is an "occupational disease" under RCW 51.08.140, which requires proving that the condition arose naturally and proximately out of his employment. *Raum*, 171 Wn. App. at 152.

27

firefighter employee maintains the benefit of the occupational disease presumption.[37]

B. Record Supports Agency's Finding Single Medical Condition: Valley Fever

Gorre asserts that he suffered from additional separate diseases, such as eosinophilia or interstitial lung disease. Whether he suffered from one or multiple diseases is a question of fact. As we previously noted, we apply the substantial evidence standard to the superior court's findings of fact, which, in turn, could "substitute its own findings and decision for the Board's only if it finds from a fair preponderance of credible evidence, that the Board's findings and decision are incorrect." *Rogers*, 151 Wn. App. at 180; RCW 51.52.115. Again, this substantial evidence standard is highly deferential to the agency fact finder; and we do not weigh the evidence or substitute our judgment for the agency's judgment about witness credibility. *See Chandler v. Office of Ins. Comm'r*, 141 Wn. App. 639, 648, 173 P.3d 275 (2007). Applying these standards here, we hold that the record supports the Board's and the superior court's

---

[37] The following factual issues may reappear on remand: To the extent that the parties elect not to relitigate these issues, we rule on Gorre's factual challenges as follows: Gorre argues that the superior court and the Board erred in (1) finding that he had only one medical condition, Valley Fever, and failing to acknowledge that he had two separate and distinct diagnoses— eosinophilia/interstitial lung disease and Valley Fever; (2) failing to acknowledge that either of these conditions qualified for the occupational disease presumption under RCW 51.32.185(1); and (3) failing to apply this statutory presumption, which would have shifted the burden to the City to show that his diseases did not arise from his firefighter employment.

We disagree with Gorre's first point and agree with the City's argument on cross appeal that, despite his respiratory symptoms, Gorre established only Valley Fever, and not an additional separate disease. But we agree with Gorre's second point—that Valley Fever is both a respiratory disease and an infectious disease for purposes of RCW 51.32.185(1)'s statutory presumption of an occupational disease, and with his third point—the Board and the superior court erred in failing to apply this statutory presumption to shift the burden of proving the disease's non-occupational origin to the City.

No. 43621-3-II

finding that Gorre suffered from a single medical condition, namely Valley Fever, which Board finding Gorre did not overcome by a preponderance of the evidence.

Only Dr. Goss believed that Gorre originally had a separate lung condition—eosinophilic lung disease, which when treated with steroids caused Gorre's onset of Valley Fever, a second disease. Gorre's other expert, Dr. Johnson, together with the other doctors and experts, disagreed with Dr. Goss's theory that Gorre's ingestion of steroids to treat eosinophilic lung disease disseminated a dormant cocci organism, which caused the onset of Gorre's Valley Fever. Rather, the other doctors and experts reached the opposite conclusion—it was the dormant Valley Fever cocci that caused Gorre's respiratory, flu-like symptoms (for example, pneumonia) to develop and manifest as Valley Fever. Dr. Bardana, for example, (1) testified that eosinophilic lung disease in firefighters is almost a non-issue; and (2) hypothesized that Gorre had developed pulmonary eosinophilic syndrome from his preexisting dormant Valley Fever such that Gorre had "one disease, . . . not two diseases," adding, "[I]t's crystal clear, and I think everybody except Dr. Goss agrees with that." ARP (June 24, 2010) at 88519.

We affirm the Board's and the superior court's findings that Gorre did not have separate symptoms of eosinophilia or interstitial lung disease and that he had only one medical condition, Valley Fever, from which his various respiratory symptoms flowed.

C. Gorre's Valley Fever—Statutorily Presumptive Occupational Disease

We next address the Board's and the superior court's findings that Gorre's Valley Fever was not an occupational disease under RCW 51.08.140 because he failed to prove a specific injury during the course of his employment and because he did not contract any respiratory conditions that arose naturally and proximately from distinctive conditions of his employment

29

with the City. We agree with Gorre that (1) the Board and the superior court erred in failing to apply the presumption of occupational disease in RCW 51.32.185 and instead placing the burden of proving an occupational disease on him[38]; and (2) Valley Fever constituted both a respiratory and infectious disease, either of which qualified for the evidentiary presumption of firefighter occupational disease under RCW 51.32.185.

### 1. Statutory interpretation

RCW 51.32.185(1)(a) and (d) creates a prima facie presumption of occupational disease for "respiratory diseases" and "infectious diseases." The statute does not define either of these types of diseases, although it provides examples of some infectious diseases. If a statute's meaning is plain on its face, then we give effect to that plain meaning as an expression of legislative intent. *State ex rel. Citizens Against Tolls v. Murphy*, 151 Wn.2d 226, 242, 88 P.3d 375 (2004). When a statute is susceptible to more than one reasonable interpretation, however, it is ambiguous and we use canons of statutory construction or legislative history. *Dept. of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 12, 43 P.3d 4 (2002). Here, we use these canons of statutory construction to discern whether the legislature intended to include Gorre's Valley Fever and its related respiratory symptoms in its "respiratory diseases" and "infectious diseases" qualifying for the occupational disease presumption under RCW 51.32.185(1).

---

[38] More specifically, when the Department and the Board failed to apply the statutory presumption, they erroneously placed on Gorre the burden to show that his respiratory symptoms arose from his firefighting occupation stress instead of starting with the presumption of a qualifying occupational disease under RCW 51.32.185(1) and looking to the City to rebut this presumption. This erroneous burden-shifting led to the Board's denying Gorre benefits based on its findings that (1) because Valley Fever is not native to Washington, Gorre's trip to Las Vegas or time spent in California constituted exposure to non-employment activity that caused his Valley Fever; and (2) therefore, Gorre's Valley Fever did not arise naturally and proximately from the course of his employment.

We discern a statute's plain meaning from the ordinary meaning of the language at issue, the context in which that statutory provision is found, related provisions, and the statutory scheme as a "whole." *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). If a statute does not define a term, however, we may look to common law or a dictionary for the definition. *State v. Pacheco*, 125 Wn.2d 150, 154, 882 P.2d 183 (1994). If a term is susceptible to two or more reasonable interpretations, it is ambiguous and we then look to other sources of legislative intent. *State v. Garrison*, 46 Wn. App. 52, 54-55, 728 P.2d 1102 (1986).

Because Washington's Industrial Insurance Act "is remedial in nature," we must construe it "liberally . . . in order to achieve its purpose of providing compensation to all covered employees injured in their employment, with doubts resolved in favor of the worker." *Dennis v. Dep't of Labor & Indus.*, 109 Wn.2d 467, 470, 745 P.2d 1295 (1987). When engaging in statutory interpretation, our fundamental objective is to give effect to the legislature's intent. *Campbell*, 146 Wn.2d at 9-10. Thus, such liberal construction is particularly appropriate for statutes addressing firefighter injuries, whose employment exposes them to smoke, fumes, and toxic or chemical substances and for whom our legislature enacted special workers' compensation protections: Recognizing that firefighters as a class have a higher rate of respiratory disease than the general public, our legislature declared that for industrial insurance purposes respiratory disease is presumed to be occupationally related for firefighters. LAWS OF 1987, ch. 515, §1.

31

No. 43621-3-II

a. Gorre's Valley Fever is a respiratory disease under RCW 51.32.185.

RCW 51.32.185(1)(a) provides that "respiratory diseases" are presumptively occupational diseases under RCW 51.08.140. But Washington law does not define "respiratory disease" in this context. Webster's dictionary defines "respiratory" as "of or relating to respiration." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1934 (2002). WEBSTER'S defines "respiration" as "a single, complete act of breathing"[39] it defines "disease" as "a cause of discomfort or harm,"[40] or "an impairment of the normal state of the living animal or plant body or any of its components that interrupts or modifies the part of the vital functions." WEBSTER'S at 648 (definition 1b). Thus the dictionary definition of "respiratory disease" is a discomfort or condition of an organism or part that impairs normal physiological functioning relating, affecting, or used in the physical act of breathing.

The medical testimony established that Valley Fever impairs a person's respiratory system. Valley Fever expert Dr. Johnson opined that Valley Fever is transmitted through inhalation exposure to arthroconidia in the soil that impacts in the lungs, usually causing pneumonic disease. Although asserting that Valley Fever is an infectious disease (and not a respiratory disease), Dr. Ayars testified that (1) symptoms of Valley Fever are generally pulmonary symptoms such as coughs, fever, and sputum; (2) the cause of Valley Fever is through the production of arthrospores in the air that when breathed into the lungs, causes disease in humans; and (3) more severe Valley Fever leads to other pulmonary symptoms, such as abscesses in the lungs, chronic pneumonias, and meningitis. Dr. Bardana testified that in

_____

[39] WEBSTER'S at 1934 (definition 1b).

[40] WEBSTER'S at 648 (definition 2a).

32

March 2007, Gorre's pulmonary function showed a small airway obstruction and 40 percent eosinophilia in his peripheral blood count, and a CT examination of his chest showed ground glass deformities and nodularities.

It was undisputed that Gorre had Valley Fever.[41] The record shows that Valley Fever is an airborne disease that humans contract through inhalation, that the organism causing Valley Fever impacts in the lungs, and that Valley Fever patients suffer respiratory symptoms and pulmonary symptoms. Accordingly, we hold that (1) Valley Fever meets the dictionary definition of "respiratory disease"—an abnormal condition impairing the normal physiological functioning of the respiratory system, which by definition includes the lungs, and therefore is a "respiratory disease" under RCW 51.32.185; and (2) the Board and the superior court erred in failing to characterize Gorre's Valley Fever as such.

b. Gorre's Valley Fever is an "infectious disease" under RCW 51.32.185.

RCW 51.32.185(1)(d) provides that "infectious diseases" are presumptively occupational diseases under RCW 51.08.140. Although Washington law does not define "infectious disease" in this context, RCW 51.32.185(4) lists four specific infectious diseases that do qualify: "Human immunodeficiency virus/acquired immunodeficiency syndrome, all strains of hepatitis, meningococcal meningitis, or mycobacterium tuberculosis." The plain language of subsection (4) does not state that this list of four diseases is exclusive; rather it provides that "[t]he presumption established in subsection (1)(d) of this section shall be *extended to* any firefighter who has contracted any of the following diseases[.]" RCW 51.32.185(4) (emphasis added).

---

[41] The City disputed only Gorre's Valley Fever origin, arguing that Gorre's Valley Fever was not related to his employment as a firefighter.

No. 43621-3-II

The City and the Department argue that the legislature intended to limit the scope of qualifying infectious diseases to the ones specifically listed in RCW 51.32.185(4). Gorre counters that because there is no limiting language in the statute to suggest otherwise, Valley Fever constitutes an infectious disease under RCW 51.32.185. We agree with Gorre.

The statute's use of the term "extended to" evinces the legislature's intent to ensure inclusion of the four diseases enumerated in subsection (4) under RCW 51.32.185(1)(d)'s presumption of occupational disease status for firefighters' "infectious diseases" in general. RCW 51.32.185(1)(d). This reading is consistent with WEBSTER'S definition of "extend"[42] as meaning "to increase the scope, meaning, or application of" and definition of "extended"[43] as "to have a wide range" or "of great scope."

In addition, nothing in the plain statutory language suggests that the legislature intended this list of four diseases to be exclusive or even illustrative; rather, it appears that the legislature included this statutory list so that firefighters could benefit from the statutory presumption of a benefit-qualifying occupational disease if they contracted one of four specified serious infectious diseases perhaps not otherwise readily recognized as occupational diseases: HIV, hepatitis, meningitis, and tuberculosis. Thus, this list of four specific diseases illustrates the legislature's

---

[42] WEBSTER'S at 804 (definition 6b).

[43] WEBSTER'S at 804 (definition 4b).

intent to expand the scope of qualifying "infectious diseases," not to limit them.[44]

Furthermore, we construe statutes to avoid absurd results. *State v. Neher*, 112 Wn.2d 347, 351, 771 P.2d 330 (1989). Our legislature has clearly stated its intent to provide benefits for firefighters, whose jobs constantly expose them to a broad range of dangers while protecting the public; and again, we are to construe these benefits liberally. Thus, it would be absurd to read this statutory provision as limiting the covered infectious diseases to only those four expressly enumerated: Such absurd construction would mean that a firefighter exposed to methicilin-resistant staphylococcus aureus (MRSA) or other staphylococcus aureus (staph infections), for example, would not be covered under the statute.

Construing the statutory framework as a whole, we read the plain language of RCW 51.32.185(4) as reflecting the legislature's intent to include "infectious diseases" in general, not to limit them to only the four specified diseases to which it "extended" coverage for firefighters who contract these four named diseases. Given all the experts who opined that Valley Fever is an infectious disease, we hold that Valley Fever is an "infectious disease" under RCW

---

[44] In contrast, if the legislature had intended to limit the scope of infectious diseases covered under the statute, it would have used limiting language similar to the language it used in the immediately preceding subsection, RCW 51.32.185(3):

> The presumption established in subsection (1)(c) of this section shall *only* apply to any active or former firefighter who has cancer that develops or manifests itself after the firefighter has served at least ten years and who was given a qualifying medical examination upon becoming a firefighter that showed no evidence of cancer. The presumption within subsection (1)(c) of this section shall *only* apply to . . .

(Emphasis added). The legislature's use of the limiting term "only" in RCW 51.32.185(3) evinces its intent to limit the types of cancers covered under the statute. But there is no corresponding limiting language in RCW 51.32.185(4).

35

No. 43621-3-II

51.32.185(1)(d) and that therefore it qualifies for the evidentiary presumption that Valley Fever is an occupational disease under the Industrial Insurance Act.[45]

Because Gorre's Valley Fever is both a respiratory disease and an infectious disease under RCW 51.32.185(1), the evidentiary presumption of firefighters' occupational disease applies; the Board, and the superior court erred in considering Gorre's benefits claim without according him the benefit of this presumption and instead, treating it as a regular occupational disease claim under Title 51 RCW, improperly placing the initial burden of proof on Gorre. We reverse and remand for the Board to apply the statutory presumption to Gorre's claim, thus shifting the burden to the City to show by a preponderance of the evidence that Gorre's Valley Fever did not qualify as an occupational disease under RCW 51.32.185.

## III. REMEDY[46]

Having held that Gorre's respiratory and/or infectious Valley Fever qualified for the presumption of firefighter occupational disease under RCW 51.32.185, we next address how to remedy the Board's and the superior court's failure to apply the presumption. To ensure that Gorre receives the legislature's clearly intended benefit of RCW 51.32.185(1), we remand to the Board to reconsider Gorre's application for industrial insurance benefits, with instructions to accord Gorre this statutory presumption of occupational disease and to place on the City the

---

[45] Title 51 RCW.

[46] Because we reverse and remand to the Board to reconsider Gorre's claim under the applicable law and the City does not prevail on appeal or on its cross appeal, we do not address the City's argument that the superior court erred in failing to award statutory fees for deposition costs it incurred at the Board level under RCW 4.84.010 and RCW 4.84.090.

36

No. 43621-3-II

burden of rebutting this presumption, if it can, by showing that Gorre's presumed occupational disease did not arise naturally and proximately from his employment.[47]

## IV. CITY'S CROSS APPEAL

On cross appeal, the City argues that the superior court (1) erred in finding that Gorre was not a smoker, (2) abused its discretion in "fail[ing] to strike" certain items of evidence, and (3) erred in failing to award its statutory costs. Br. of Resp't/Cross-Appellant at 45. The City's first and second arguments fail; because we reverse and remand, we do not address the third argument.

### A. Gorre Not a Smoker under RCW 51.32.185(5)

The City argues that Gorre's smoking history should preclude application of RCW 51.32.185's occupational disease presumption to his benefits claim. Gorre responds that his medical records and history established that he was not a smoker and provided substantial evidence to support the Board's and the superior court's finding that he was not a smoker under RCW 51.32.185. And there is no evidence in the record to the contrary; thus, we agree with Gorre.

---

[47] Because the Board has not yet considered Gorre's application with the benefit of the statutory presumption and its burden-shifting consequence, it is premature for us to address the City and the Department's cross appeal request to hold that the City effectively rebutted the presumption by showing that Gorre did not incur any disease that arose naturally or proximately from his employment and, therefore, did not qualify as an "occupational disease." Br. of Resp't at 28; Br. of Resp't/Cross Appellant at 39. *See Raum*, 171 Wn. App. at 151.

37

No. 43621-3-II

The City is correct that RCW 51.32.185's evidentiary presumption of occupational disease does not apply to a firefighter who is a regular user of tobacco products or who has a history of tobacco use:

> Beginning July 1, 2003, this section does not apply to a firefighter who develops a heart or lung condition and who is a regular user of tobacco products or who has a history of tobacco use. The department, using existing medical research, shall define in rule the extent of tobacco use that shall exclude a firefighter from the provisions of this section.

RCW 51.32.185(5). The City is incorrect, however, that the evidence showed Gorre fell within this statutory tobacco user category.

Neither the legislature nor the common law has defined the extent of tobacco use that qualifies for this RCW 51.32.185(5) exclusion from the statutory presumption of occupational disease. But the Washington Administrative Code (WAC) has defined what constitutes a current and former smoker: A "current smoker" "is a regular user of tobacco products, has smoked tobacco products at least one hundred times in his [or] her lifetime, and as of the date of manifestation did smoke tobacco products at least some days." WAC 296-14-315. The record does not support a finding that Gorre is a current smoker under this definition. A "former smoker" "has a history of tobacco use, has smoked tobacco products at least one hundred times in his [or] her lifetime, but as of the date of manifestation did not smoke tobacco products." WAC 296-14-315. The record does not support a finding that Gorre was a former smoker under

38

this definition.[48] On the contrary, the record supports the Board's and the superior court's finding that he was not a "smoker" under RCW 51.32.185(5).

B. City's Motion To Strike Evidence Presented in Superior Court

The City next argues that the superior court should have stricken Gorre's new evidence: the Rose Environmental report about the indoor environmental quality at Gorre's residence, Dr. Goss's declaration about Gorre's medical history, Dr. Bollyky's letter about Gorre's Valley Fever and how Gorre's exposure was possibly work-related, and Matthew Simmons' testimony about his own medical conditions and how they potentially arose from his employment as a firefighter. Gorre responds that the superior court did not err in admitting this evidence because a superior court reviews a Board decision de novo. Again, we agree with Gorre.

A superior court reviews decisions under the Industrial Insurance Act de novo, relying on the certified Board record. *Raum*, 171 Wn. App. at 139 (citing RCW 51.52.115). Under RCW 51.52.115, a superior court may not receive evidence or testimony other than or in addition to the evidence before the Board unless there were irregularities in the Board's procedure. RCW

---

[48] The City argues that the testimonies of Dr. Bardana, Dr. Eckert, and Dr. Weinstein establish that Gorre was a former smoker. At most, however, the record shows that Gorre experimented with smoking cigarettes in his youth and had an occasional cigar between the ages of 20 and 30. City witnesses Dr. Eckert and Dr. Weinstein both testified that Gorre had quit smoking: Dr. Eckert stated that Gorre had quit smoking in 1990, and Dr. Weinstein testified that Gorre's intake form stated that he had quit smoking at age 30 (1998). Dr. Bardana testified that Gorre's records showed that he had a chewing tobacco history, which he had stopped in 1997, but that Gorre's history of sampling cigars and chewing tobacco amounted to minimal, minuscule amounts of tobacco exposure.

Gorre also testified that he was not a smoker; that he had tried a cigarette once in fourth grade and in high school, that he had smoked cigars on special occasions, and that he had chewed tobacco when he played baseball. Gorre also testified that he had written that he did not smoke on his October 12, 2007 intake form for Dr. Kirkwood Johnston, his rheumatologist. Gorre had similarly written on his May 2, 2007 intake form for Dr. Goss that he did not smoke.

No. 43621-3-II

51.52.115. A superior court has discretion to rule on a motion to strike evidence. *King County Fire Prot. Dist. No. 16 v. Hous. Auth. of King County*, 123 Wn.2d 819, 825-26, 872 P.2d 516 (1994).

Contrary to the City's argument, the Rose Environmental report was neither hearsay nor new evidence; rather it was part of the Board record,[49] which the superior court was entitled to consider. Similarly, when the IAJ admitted Dr. Goss's declaration into evidence, it became part of the Board record,[50] which the superior court was entitled to consider, despite the City's hearsay characterization. Because Gorre voluntarily withdrew Dr. Bollyky's letter during the superior court summary judgment hearing below, it is neither part of the record before us nor an issue on appeal.

The City also asserts that the IAJ ruled Simmons' medical testimony was irrelevant and disallowed it; and thus, the superior court erred in failing to strike Gorre's reference to Simmons' hearsay testimony in Gorre's superior court brief. The City mischaracterizes Gorre's use of Simmons' testimony: Gorre did not use Simmons' testimony to further his summary judgment arguments at the superior court level. Rather, Gorre merely explained to the superior court that

---

[49] The City had moved to exclude this report at the Board level, but the IAJ did not rule on it. Absent a ruling excluding this report, it remained part of the Board record. *See* RCW 51.52.115.

[50] An administrative court is not bound to follow the civil rules of evidence; on the contrary, relevant hearsay evidence is admissible in administrative hearings. *Nisqually Delta Ass'n v. City of Dupont*, 103 Wn.2d 720, 733, 696 P.2d 1222 (1985); *Pappas v. Emp't Sec. Dept.*, 135 Wn. App. 852, 857, 146 P.3d 1208 (2006); *Hahn v. Dep't of Ret. Sys.*, 137 Wn. App. 933, 942, 155 P.3d 177 (2007). *See also* RCW 34.05.452(1), which summarizes the relaxed evidentiary standards in administrative hearings and broad discretion for the presiding officer.

40

No. 43621-3-II

Simmons' testimony "was disallowed at the [Board of Industrial Insurance Appeals] BIIA hearing."[51] CP at 13.

CONCLUSION

We hold that the superior court did not err or abuse its discretion as the City asserts on cross appeal. Thus, we affirm both the superior court's finding that Gorre was not a smoker and the superior court's decision not to strike the evidence Gorre presented. But we reverse the superior court's findings of fact and conclusions of law (1) that Gorre did not have an occupational disease under RCW 51.08.140, (2) that Gorre did not contract any respiratory conditions arising naturally and proximately from his City employment, and (3) that the Board's decision and order are correct. We also reverse the corresponding Board findings and conclusions that the superior court affirmed: Finding of Fact 1.2; Conclusions of Law 2.2, 2.3, 2.4.

We reverse the superior court's affirmance of the Board's denial of Gorre's RCW 51.32.185 firefighter-occupational-disease worker's compensation claim; we also reverse the underlying Board decision denying Gorre's claim. We remand to the Board for reconsideration of Gorre's claim with instructions (1) to accord Gorre RCW 51.32.185's evidentiary presumption

---

[51] In other words, Gorre never offered Simmons' medical testimony at the superior court level. Consequently, Simmons' testimony was not before the superior court and, thus, not subject to being stricken.

No. 43621-3-II

of occupational disease and (2) to shift the burden of rebutting this presumption to the City to disprove this presumed occupational disease by a preponderance of the evidence that the disease did not arise naturally or proximately out of Gorre's employment.

Hunt, J.

We concur:

Worswick, C.J.

Penoyar, J.P.T.

42